## WOOD et al. v. KEYSER et al.

(District Court, N. D. Florida. July 3, 1897.)

1. DEMURRAGE—EXCEPTIONS IN CHARTER PARTY—STRIKES.

The term "strike," contained among the exceptions as to the running of lay days stipulated for in a charter party, should be accepted in its ordinary sense, as meaning that the charterers should be excused for any delay occasioned by a refusal of all the available workmen to work except charterers should pay an advance in wages made or demanded in the midst of the loading of a vessel, after the contract of the charterers and owners had been made upon the basis of wages formerly paid.

2. SAME—LAY DAYS.

Days lost in putting up the gear of a vessel, preparatory to taking her cargo, being, under the terms of the charter party, a part of the duty of the merchant, should be included in the running of the lay days.

3. SAME—WORKING DAYS.

Where, by the custom of a port, baymen stop work upon the day of the funeral of one of their deceased members, and also where they stop work on days which are not legal holidays, but which they desire to commemorate thereby, no allowance should be made therefor out of the days stipulated as lay days, as the term "working days" includes all days except Sundays and legal holidays; and, as these days cannot be excepted under any other provision of the charter party, they should be computed in the running of lay days.

This was a libel in admiralty to recover demurrage, alleged to be due under a charter party. On final hearing on libel, answer, and stipulation of facts.

Convers & Kirlin, Liddon & Eagan, and B. C. Tunison, for libelants.
John C. Avery, for respondents.

SWAYNE, District Judge. This is an action by the owners of the British steamship Daybreak against the charterers to recover demurrage for the detention of the said vessel at Pensacola, the loading port, for 13 days in excess of the 14 working days allowed in the charter party for the furnishing of the cargo. The libel alleges the ownership of the steamship by the libelants, the making of the charter party, and that the vessel proceeded to Pensacola, and on the 31st day of March, 1896, gave notice of readiness to receive cargo, but shipment was not completed within the time fixed, but was delayed for a period of 14 days, for which libelants claim the stipulated demurrage, with interest thereon from April 20, 1896, to the date of the payment thereof. Respondents filed an answer, in which they admitted making the said charter party, but set up conditions which they alleged to amount to a strike among the baymen who were engaged in the loading of vessels in the port of Pensacola, preventing the loading of the vessel within the days allowed by charter party. The parties, by their proctors, filed stipulations to take the place of testimony. On said libel, answer, and testimony, the cause was submitted for final hearing. The charter party was for a full cargo of sawn timber, deals or boards, at merchants' option, for a port in Europe. From the record it is shown that a mixed cargo from charterers was placed as cargo. Among the conditions of the said charter party was the following:

"The act of God, * * * floods, droughts, * * * riots, strikes, or stoppage of labor, collisions, stranding, * * * or any other extraordinary occurrence beyond the control of either party," were always mutually excepted.

It further provided that lay days should commence the day after the vessel was ready to receive cargo, and notice given thereof, but that days for discharging should be according to the custom of the port of discharge, and continued:

"In the computation of the days allowed for delivering and receiving the cargo shall be excluded any time lost by reason of fire, droughts, floods, storms, strikes, lockouts, combinations of workmen, or any extraordinary occurrence beyond the control of the charterers or the receivers of the cargo."

The cargo was to be delivered to the vessel alongside, "and within the reach of ship's tackle," and up to that time to "be at merchants' risk and expense," and to be received by the master, and secured by the ship's dogs and chains, when so delivered, and then to be at ship's risk. It also provided, "Charterers or their agents to appoint and pay a stevedore to do the loading and stowing of the cargo under the supervision of the master," to supply dogs and chains, and to pay all port charges, at $2 per load of 50 cubic feet on cargo loaded; owner having a lien on cargo for freight, dead freight, and demurrage. The cessor

84 F.—44

clause in the charter party was expressly waived before the vessel sailed, and it was agreed that the matters in dispute in this cause might be decided in an action in admiralty or at law. Respondents admit the delay, but set up as an excuse that certain days were stormy, and that on other days the workmen would not work, on account of a funeral of one of their number. But the principal cause of delay, and the main question of contention in this and the other cases submitted herewith, is the allegation that there was a strike among the workmen who were expected to load the cargo; and therefore the charterers claim exemption from damages for delay, under the clause of the charter party which provides that:

"In the computation of the days allowed for delivering and receiving the cargo shall be excluded any time lost by reason of fire, droughts, floods, storms, strikes, lockouts, combinations of workmen, or any extraordinary occurrence beyond the control of the charterers."

It is vigorously contended in this case, on the part of the charterers, that the strike which existed at the time the loading was taking place was such a strike as was intended by the parties to the contract to cover at the time it was signed, and therefore the charterers should not be liable for delay caused thereby. Upon the other hand, the libelants maintain that the expression in clause 9, "beyond the control of the charterers," means that if it were possible for the charterers to yield to the demand of the strikers, by an increase of wages, and they could have, under these circumstances, loaded the vessel, then the strike was not "beyond the control" of the charterers, and they are not entitled to exemption for demurrage. The libelants further contend that where the time for loading a vessel is fixed definitely in the charter party, so that it can be calculated beforehand, the charterer thereby agrees absolutely to load her within the prescribed time, and he takes the risk of all unforeseen circumstances; and the principal case they cite to maintain this contention is that of Brown v. Certain Tons of Coal, in 34 Fed. 913, in which Severens, J., speaking of the subject of strikes, and the effect upon the delay of a vessel, says:

"He refused to pay—whether justly or unjustly, I do not know—the price that was charged by the laborers in that vicinity for unloading a vessel. He higgled over a little difference of 10 cents an hour to those employés, and permitted the vessel to lie there until he could coerce the employés to accept 40 cents instead of 50 cents an hour; thereby attempting to save to himself a pittance, while subjecting the other parties to serious loss and damage. It is therefore held in this case, as a matter of fact, that the consignee did not use reasonable care and diligence."

Sanborn, Circuit Judge, in Empire Transp. Co. v. Philadelphia & R. Coal & Iron Co., 23 C. C. A. 564, 77 Fed. 919, referring to the same difference in wages between employer and employés in the matter of strikes, says:

"The suggestion that the Reading Company might have resumed operations earlier by hiring men who had discharged themselves at the rate of 50 cents instead of 40 cents an hour, and by agreeing not to prefer other workmen as employés, is not entitled to extended consideration. The market rate of wages for men of this class was 40 cents an hour. That was the rate at which the strikers worked without complaint until they abandoned their employment.

That was the rate at which the new employés were paid. To exercise all reasonable diligence does not require an employer to hire, at wages 25 per cent. above the market rate, a set of men who have abandoned its employment without warning, at a critical time in the conduct of its operations, and banded themselves together to prevent, by intimidation and violence, other workmen from carrying on its legitimate business. Nor does it require such employer to agree not to prefer, or not to prefer in fact, faithful and willing laborers at going wages, as its employés, to those who have acted in this way, at wages 25 per cent. higher." And then the learned judge adds: "There is nothing in Brown v. Certain Tons of Coal, 34 Fed. 913, in conflict with these views."

This decision by Sanborn, Circuit Judge, is not only one of the very latest (having been delivered in August, 1896), but is one of the best-considered, cases cited. and contains many valuable references. There is much in it to sustain the proposition in libelants' brief, that if the charterers could, by any reasonable effort, have avoided the strike, or secured other laborers with which to load the vessel, then they would be liable. On page 7 of the brief of Convers & Kirlin, they say that the charterers must secure workmen if it were possible to get them at reasonable terms, and if those whose services they had, or expected to have, refused to work for them on reasonable terms, they must secure others, if possible. The court apprehends that this is the proper construction that should be put upon the clause in question in this case. In the case above referred to, Sanborn, Circuit Judge, on page 568, 23 C. C. A., and page 923, 77 Fed., speaking of the question of customary time, or usual time, as compared with reasonable time, in that case, says:

"We have failed to find any decision among the cases cited by counsel for appellants to the effect that a custom of a port excludes other facts and circumstances from consideration in determining the reasonableness of the time of the boat's discharge, or of the diligence of the charterer. The decisions and opinions to which he referred amount to nothing more than this: That when a ship is to be unloaded, under ordinary circumstances, the customary method and the customary time in its port of delivery prove the reasonable method and the reasonable time, and measure the liability for detention, in the absence of countervailing evidence. But suppose that the circumstances are extraordinary; suppose that the threats of reckless men and the violence of mobs suspend the operation of every custom of a port, and hold willing laborers and anxious dock owners alike in enforced idleness and utter helplessness for days; is the customary time for the discharge of a vessel under ordinary circumstances the reasonable time under such circumstances? Shall the reasonableness of the time within which a charterer is required to unload a vessel under such circumstances be measured by a consideration of ordinary circumstances only, or by a consideration of all the actual facts and circumstances at the time he was required to unload her?" He adds: "It is not a new question. It has been carefully and exhaustively considered in the English and American courts,"—and cites a number of cases thereon.

All the American decisions show that, whether the custom of a port is proved or not, all the facts and circumstances, ordinary and extraordinary, which exist at the time of the unloading, have been uniformly considered in determining the reasonableness of the time of discharge. The American cases apply the same rules of law to these contracts, where the customary time of discharge is proven, that they do when no custom is established; and the test of the lia-

bility of the charterer for the delay is the reasonableness of the time occupied in unloading, in view of all the facts and circumstances at that time. Any other rule would contradict and destroy itself. It is settled that the obligation of the charterer is to load the ship in a reasonable time. Our reason teaches that that time is reasonable under ordinary circumstances (that is, customary), but is unreasonable under extraordinary circumstances. If extraordinary circumstances can never be considered to determine the reasonableness of the time, then the charterer must always unload all vessels that arrive under unusual circumstances in an unreasonable time. It is admitted by the stipulations filed in this case that the charterers were unable to obtain other labor than that of the strikers with which to load the vessel; and the court holds in this case that the demand that they should be compelled to pay an advance in wages, made in the midst of loading, after the contract between the charterers and the owners had been made upon the basis of the wages formerly paid, and a refusal to work unless the demand was acceded to immediately, was, in the estimate of the court, an unreasonable demand, and one which the charterers were not required to comply with, in carrying out the spirit and the intention of the parties to the contract at the time it was made. To say that the charterers could avoid the effect of the strike by granting the demands of the strikers and paying the additional wages, and thus save the vessel from damage and the charterers from liability, is to virtually nullify the purpose for which the clause was inserted in the charter party. If such were the law, and the charterers should promptly comply in every instance with the demand of the strikers, then there would never be a strike. If the clause does not mean protection to the charterers, under the circumstances in this case, then it has no meaning, and no reasonable interpretation can be put upon it. The court does not feel bound, and is not in any way inclined, to lend its power to aid a set of men to squeeze their employers into an unconscionable and unreasonable contract, made at a time of great necessity, and under the fear upon the part of the charterers that they will be mulcted in damages, as contended for by the libelants here, if they do not yield to their demands.

As to the other causes of delay, to wit, the funeral of the baymen, the day occupied in putting up the tackle for loading the vessel, and for cessation of work on Good Friday, it appears that these days do not fall within the exceptions of the charter party, as, properly speaking, they are "working days," which term includes all days except Sundays and legal holidays; and I am of the opinion that the custom of baymen to cease labor on these days, as set forth in the answer, is not such a stoppage of labor as was contemplated by the charter party. The day lost in putting up the gear of the ship should count in lay days, as it may reasonably be included in the work of stowing the vessel; it not being contended that it is part of the duty of the vessel to so fit herself, in order to fall within the terms of the charter party, "Lay days to commence on the day after

the vessel is ready to receive cargo, and written notice of same given to charterers." It appears from the record that these matters were the custom of the port, of which the charterer, at the time of the making of the charter party, had full knowledge; and for the delay occasioned by such custom he was entitled to provide, and knew that they might be liable to occur. For the loss of days occurring from the last-mentioned causes, the charterers can plead neither ignorance nor surprise, and the court thinks that they should be held liable for damages for any time over lay days lost for these reasons.