## HAGERMAN v. NORTON.

(Circuit Court of Appeals, Fifth Circuit. January 15, 1901.)

No. 1,006.

1. SHIPPING—DEMURRAGE—LOADING CARGO—STOPPAGE OF LABOR.

Where a charter provided that a certain number of working days should be allowed for loading the vessel, detention caused by strikes or "estoppage of labor" not included, days on which those loading the vessel refused to work owing to storms, and days when the labor organizations withdrew their members to attend a funeral and for the celebration of Labor Day, should not be excepted from the days allowed for loading; all days save Sundays and legal holidays being working days, and there having been no forced stoppage, within the meaning of the charter party.

2. SAME—CUSTOM OF PORT.

Where a charter party provided that 14 working days should be allowed for loading the vessel in the port of Pensacola, and that the custom of each port was to be observed in all cases, and the vessel was delayed more than 14 working days owing to the members of labor organizations refusing to work on days generally recognized as working days, a contention that, the practice of such labor organizations being known to ship owners, the delay should be excused, under the clause relative to customs of ports, was without merit, since the custom of labor organizations in the port of Pensacola, and their manner of refusing to work, being known to the charterer of a ship, if he wished to protect himself from the results of their refusal to work on days generally regarded as working days he should so provide in his charter party.

3. SAME—DUTY OF CHARTERER.

Where a charter provided that a vessel should proceed to Pensacola and there load, the cargo to be delivered alongside, and that 14 working days should be allowed the charterers for loading the vessel, a contention that under the terms of the charter party the duty of the charterer was ended when the cargo was delivered alongside, and that all delays in loading and stowing the cargo were at the risk of the ship owner, was without merit.

Appeal from the District Court of the United States for the Northern District of Florida.

Libel by Charles W. Hagerman against Benjamin Norton to recover demurrage under a charter party. From a decree in favor of libelant, libelee appeals. Affirmed.

B. C. Tunison, S. M. Loftin, B. S. Liddon, and John Eagan, for appellant.

W. A. Blount and A. C. Blount, Jr., for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. This is a libel to recover demurrage under a charter party which contains provisions as follows:

"That the said vessel shall with all convenient speed sail and proceed to Pensacola, * * * there load (always afloat) from the said merchants, * * * as they may direct, a full and complete cargo, to consist of pitchpine sawn timber. * * * Sufficient suitable timber and/or deals and/or boards, at merchants' option, to be supplied for beam fillings and stowage as required by master. * * * Loss, damage, or detention by the act of God, restraint of princes and rulers, public enemies or people, quarantine, epidemics, pirates or robbers, barratry of the master or crew, fire from any cause or wheresoever occurring, perils of the sea or other waters, riots,

strikes, or estoppage of labor, or lockouts of seamen or shore laborers, whether partial or otherwise, and any consequence thereof, * * * or any other extraordinary occurrence beyond the control of either party, always mutually excepted. * * * The cargo to be delivered alongside at merchants' risk and expense, secured by dogs and chains, and to be received by the master, and when so delivered to be then at ship's risk. The ship to discharge each lighter having lumber for cargo or broken stowage without unreasonable detention. Should the master order more timber or deals or boards alongside than the ship requires for loading, the expense of returning it to the booms to be paid by the ship. * * * Fourteen working days are to be allowed charterers or their agents for loading the vessel, which time is to commence on the day after the vessel is ready (in loading berth) to receive cargo, and written notice given of same to charterers or their agents, but days for discharging shall be according to the custom of the port of discharge. Should the cargo not be delivered to the vessel at port of loading, or received at port of discharge, within the specified time, by default of charterers or their agents, for each and every day over and above said lay days charterers or their agents are to pay the sum of sixpence sterling per net register ton demurrage; any detention through quarantine not to count in lay days. * * * Charterers or their agents to appoint and pay the stevedore to do the stowing of the cargo under the supervision of the master. * * * Cargo to be delivered to vessel at port of loading alongside, and to be taken from alongside at port of discharge, always within reach of ship's tackle, and at merchants' risk and expense, vessel always being afloat. * * * The custom of each port to be observed in all cases where not specially expressed. * * *"

There is no dispute that the ship was detained in loading 6 days beyond the 14 days, exclusive of Sundays and legal holidays, and demurrage for these 6 days was allowed in the court below. The first contention is that these extra 6 days should not be allowed, because thereon there was a stoppage of labor, as on three the baymen engaged in loading the vessel stopped and refused to work because of storms existing in the Bay of Pensacola; on another the said baymen so employed refused to work for the reason that on that day the funeral was to take place of a deceased bayman, and on this day the said labor organizations compelled and required all the baymen engaged in loading timber in the Bay of Pensacola to leave and quit their work, and there was by reason of the action of said labor organizations a general stoppage of labor in the Bay of Pensacola on said day; and on another the labor organizations withdrew all their members from work in stowing vessels for the purpose of celebrating the said day as Labor Day, so called by them; and all the laborers engaged there on the said day refused to labor thereon, and no labor was done by said baymen on said day, or on any vessel in said port, and the action of said labor organizations did on this day bring about a general stoppage of labor. It is further contended that the existence of labor organizations, and their customs and practices in regard to the manner in which they work in stowing vessels in the port of Pensacola, and their arbitrary manner of refusing to work, are well known to libelant and ship owners generally whose ships come to the port of Pensacola, wherefore it is contended that, under the provision of the charter party that "the customs of each port to be observed in all cases where not specifically expressed," excuses the respondent for the delay in question. It is well settled that the term "working days," as ordinarily used in charter parties, excludes Sundays and holidays, but not rainy nor stormy days. Pedersen v.

Eugster (D. C.) 14 Fed. 422; Wood v. Keyser (D. C.) 84 Fed. 692. In the last-cited case the charter party contained not only the provision that "the act of God, * * * floods, droughts, * * * riots, strikes, or stoppage of labor, * * * or any other extraordinary occurrence beyond the control of either party, were always mutually excepted," but the further provision that "in the computation of the days allowed for delivering and receiving the cargo shall be excluded any time lost by reason of fire, droughts, floods, storms, strikes, lockouts, combinations of workmen, or any extraordinary occurrence beyond the control of the charterers or the receivers of the cargo"; and yet the district court held, and the same was afterwards affirmed in this court, as follows:

"As to the other causes of delay, to wit, the funeral of the bayman, the day occupied in putting up the tackle for loading the vessel, and for cessation of work on Good Friday, it appears that these days do not fall within the exceptions of the charter party, as, properly speaking, they are 'working days,' which term includes all days except Sundays and legal holidays; and I am of the opinion that the custom of baymen to cease labor on these days, as set forth in the answer, is not such a stoppage of labor as was contemplated by the charter party."

We think that this ruling, in principle, covers the case of Labor Day, which was conceded not to be a legal holiday. The days on which the baymen refused to work because of storms which prevailed in the port of Pensacola are clearly not days excepted under any provision of the charter party, as the baymen certainly did not quit because of any strike or forced stoppage of labor. We are of opinion that with regard to the customs and habits of the labor organizations in the port of Pensacola the charterers of ships are as well informed as the owners, and if either wishes to protect himself from any of the peculiar results occasioned by organized labor, and thus derogate from the established rule as to working days, let him specifically provide for it in the contract.

The other contention of the appellant in this case is that under the terms of the charter party the duty of the charterers was ended when the cargo was delivered alongside, and that all delays in loading and stowing cargo aboard are at the risk of the ship owner. A recital of the various provisions of the charter party above quoted is a sufficient answer to this contention. A similar charter party was considered in the case of The Assyria, 39 C. C. A. 97, 98 Fed. 316, and it was held:

"Where a charter party provided that a cargo of lumber should be loaded by the charterer, and should be 'furnished' at the average rate of 50,000 superficial feet per running day, the lay days for loading are to be computed on the amount actually loaded, and not upon the amount delivered to the vessel for loading, a part of which was not actually loaded."

As we find no error in the record, the decree of the district court is affirmed.