[Signed]                                                Wm. G. Choate.

---

PECK v. UNITED STATES.

(Circuit Court, S. D. New York. April 1, 1907.)

1. SHIPPING—CHARTER PARTY—TIME FOR LOADING.

Where a charter party fixes no time for the loading by the shipper to begin or end, the law will presume that a reasonable time under all the circumstances known to the parties or presumed to have been within their contemplation was intended, and a provision for such reasonable time will be considered as agreed to by the parties.

2. SAME—CONSIGNMENT OF VESSEL TO THIRD PARTY FOR LOADING.

In the absence of some agreement to the contrary between owner and charterer or some evidence showing a contrary intent, the party who is to load the vessel will be deemed the agent of the charterer, and, when the charterer consigns the vessel to another for loading, it makes itself responsible for the acts or omissions of such consignee the same as though it had directed the vessel consigned to itself at the same place.

3. SAME—DEMURRAGE.

The United States chartered a vessel to carry a cargo of about 2,000 tons of bituminous coal from Philadelphia to a Philippine port, to be loaded in January or February. The vessel was to be consigned for loading to a contractor for supplying the coal to be designated after she was ready to load. The contract contained no provision as to time for loading or for demurrage for delay therein but did in respect to her discharging, which was to be done by the government at a specified rate, subject to a stated demurrage for delay. The vessel was delayed in fitting until February 18th, on which date the government was notified of her readiness to load. On the 20th the government notified a contractor with which it had pre-

viously contracted for a quantity of dry coal to load the ship, and on the 24th directed the vessel to report to such contractor for loading, but, owing to its inability to obtain shipments of coal by rail, the contractor could not obtain dry coal sufficient to load the cargo until March 11th. *Held,* that the inability of the contractor to obtain shipment to its docks sooner was not a cause which exonerated it or the government, whose agent it was, from liability for the delay in loading, but that the government was entitled to a reasonable time after notice of the readiness of the vessel in which to designate the contractor who was to load, and that the six days taken was not unreasonable; that the contractor was also entitled to a reasonable time after notice to it in which to supply the cargo; and that under all the circumstances the vessel owners were not entitled to recover for the delay prior to February 28th, but for the subsequent delay they were entitled to recover of the government damages in the nature of demurrage.

[Ed. Note.—Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

## Action for Demurrage.

This is an action or proceeding on petition filed by Arza C. Peck and John A. Peck, doing business under the firm name of De Groot & Peck, to obtain judgment against the United States for the sum of $1,600 for damages, commonly denominated "demurrage," which petitioner claims the defendant became liable to pay by reason of its unreasonable and unwarranted delay in loading, or procuring to be loaded, the petitioner's American sailing ship Luzon with a cargo of coal at Philadelphia, Pa., as it was its duty and obligation to do under the provisions of a certain charter party or contract. The petition is filed under and pursuant to the provisions of an act of the Congress of the United States known as the "Tucker Act." Arza C. Peck died after the petition was filed, and John A. Peck is the surviving partner.

James T. Kilbreth, for petitioner.

Henry L. Stimson, U. S. Atty., and Winfred T. Denison and Francis W. Bird, Asst. U. S. Attys.

RAY, District Judge. About December 14, 1904, the petitioners made a proposal in writing to the United States to transport for it 1,900 to 2,000 tons of bituminous coal from Philadelphia, Pa., to Sangley Point, Philippine Islands, which, after some correspondence by letter and telegrams, the material parts of which will be stated, was accepted, as modified, January 3, 1905.

The proposal was, further:

"Shipment of the entire quantity made in one shipment. Shipments to commence January or February loading. Each ship to be consigned to the contractor for supplying the coal at point of loading, and when loaded to sail immediately."

On arrival at destination the ship was to report to the commandant and be subject to his orders in matter of discharge of cargo, "all expenses of loading to be borne by contractor," the government to discharge cargo at its expense. Then followed this provision as to demurrage:

"(5) Cargo to be discharged at the rate of four hundred (400) tons per day for such part of cargo as may be necessary to discharge in the bay to enable a vessel of deep draft to go to wharf, and six hundred (600) tons per day at wharf, Sundays and legal holidays excepted in each instance, or the Government pays demurrage at the rate of eight (8) cents per ton per day on the net registered tonnage of the vessel, for any detention caused by the Government

(through fault of its own), not discharging at the above named rates, it being understood that· twenty-four (24) hours' notice of arrival of each cargo shall be given to the commandant before lay days commence, and further, that in the event of a cargo arriving before the preceding cargo is discharged, twenty-four (24) hours' notice of arrival shall be given after discharge of each cargo before lay days commence in case of that next arriving.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"(9) Any question of demurrage to be settled at Washington."

Also the following:

"(12) Each ship loading under the contract to be nominated at least five (5) days prior to reporting to load."

The other provisions of the proposal have no bearing on the questions at issue. There was no provision as to demurrage or damage for delay in loading at the place of shipment. December 16, 1904, the government offered to accept on condition that vessel might be loaded at four different points named. This was rejected same day. December 17th the government inquired: "What is position of Luzon? when will she be ready to load if accepted?" The reply was: "Ship Luzon can be ready for January loading." The same day the government wrote:

"(2) When the bureau wired you yesterday that it would accept the ship, conditioned upon loading at other points than Philadelphia, the bureau was aware of a decided shortage of coal at Philadelphia, and had already ordered a 5,000 ton ship loaded at that place. This ship has been withdrawn however, and the Bureau will arrange to load the Luzon.

"(3) When the ship is about ready to report for cargo, please wire the bureau, and you will be informed as to her consignment for loading."

December 19th De Groot & Peck wrote the government:

"The Luzon is now at Philadelphia, and before she will be ready to load we have to put a new main water tank in, which the tank people say will take say three to four weeks to do; hence our proposal was January or February loading. It may be possible to make January loading, but, on reflection we doubt if she could do it. Please advise us, should Luzon be unable to make January loading, would February loading be satisfactory to you as per our proposals? As you know, vessels leaving here during February will reach the Phil. Is. as soon as those leaving here in January."

The answer of December 20th said:

"(2) The bureau's principal desire with reference to this ship is to get her with her cargo to Sangley Point at the earliest practicable date, and the bureau hopes that she will be put in a position to load as quickly as possible. If not ready for January loading, she will be accepted for February loading."

De Groot & Peck replied December 21st as follows:

"We are in receipt of your letter of Dec. 20, 1904, and refer to #103,906, in which you accept our ship Luzon, under our proposal to load coal at Philadelphia for Manila, Phil. Is., for January or February loading. We will proceed, at once, to put the ship in condition to carry out this proposal, and will report her ready as soon as possible. Will it be necessary for us to sign an additional contract, or is our proposal sufficient?"

The government replied that it had submitted requisition for the proposed service containing all the conditions agreed upon; that same would be submitted to them by purchasing pay officer of the Navy at

New York "for formal acceptance, and, if acceptable, you will sign the same, stating price and return it to that office. This accomplishes the contract."

The requisition containing the conditions, etc., is dated January 3, 1905, and is signed by L. G. Boggs, pay director United States Navy. This contained the following:

"(1) Transportation of from 1,900 to 2,000 tons bituminous coal from Philadelphia, Pa., to the U. S. Naval Coal Depot, Sangley Point, Manila Bay, Philippine Islands.

"(2) Shipment to be made in American sailing ship 'Luzon' (net registered tonnage 1.339 tons).

"(3) Shipment to be made during the month of January or February, 1905; ship to be consigned to the contractor for supplying coal at the point of loading (to be hereafter named), and when loaded to sail immediately. On arrival at Cavite to report to the commandant at that place, and be subject to his orders in the matter of discharge.

"(4) All expenses of loading to be borne by the contractors; the government discharges cargo at its expense.

"(5) The government guaranties but twenty (20) feet of water at coaling wharf, Sangley Point.

"(6) Cargo to be discharged at the rate of (400) four hundred tons per day for such part of cargo as may be necessary to discharge in the bay to enable a vessel of deep draft to go to wharf, and (600) six hundred tons per day at wharf, Sundays and legal holidays excepted in each instance, or the government pays demurrage at the rate of eight (8) cents per ton per day on the net registered tonnage of the vessel, for any detention caused by the government (through fault of its own) not discharging at the above-named rates, it being understood that twenty-four (24) hours' notice of arrival of each cargo shall be given to the commandant before lay days commence, and, further, that in the event of a cargo arriving before the preceding cargo is discharged, twenty-four (24) hours' notice of arrival shall be given after discharge of each cargo before lay days commence in case of that next arriving.

\* \* \* \* \* \* \* \* \*

"(10) Any question of demurrage to be settled at Washington."

There was no other reference to demurrage or responsibility for delays at any point.

The contract, therefore, as far as material, stood as follows: (1) De Groot & Peck were to transport from Philadelphia to Manila Bay, Philippine Islands, for the government, at price named, from 1,900 to 2,000 tons of bituminous coal in ship Luzon. (2) The shipment was to be made at Philadelphia, Pa., at some time during the months of January or February, 1905, by some contractor with the government for supplying coal, which contractor was to bear all the expenses of loading. (3) The government was to discharge the cargo at Manila Bay at its own expense at a certain rate, and within a stated time or pay demurrage at the rate of "eight cents per ton per day, \* \* \* any question of demurrage to be settled at Washington." (4) By implication, and as drawn from the prior correspondence, De Groot & Peck were to report when their ship Luzon was ready for loading, and the government was then to name the party or contractor at Philadelphia who would load the vessel, thereupon the Luzon was to proceed to the loading point designated, receive the coal, and proceed on her voyage. The obligations of the parties under such an

indefinite contract as to time and place of loading will be considered later. February 1, 1905, De Groot & Peck wrote:

"Will you please inform us who is to load us at Philadelphia, or who will furnish the coal. We ask so as to arrange regarding the ballast that is in the ship, and to provide stiffening, if necessary."

The government telegraphed February 2d:

"Necessary to know when Luzon will be ready to load before determining who will load her please wire information."

The answer, dated February 2d, was:

"The Luzon now has 100 tons stone ballast in, and she cannot shift without about this weight. Our object in writing was to arrange regarding the ballast so as to be ready when she moves to the coal dock, and avoid delay. We have the new tank on board, and the men are putting it up and together, which will take this week and probably all of next week, so as to say just when Luzon will be ready is a little hard. The weather has been very much against us."

February 3d the government wrote De Groot & Peck as follows:

"(2) The bureau will endeavor to have the Luzon loaded by the Berwind-White Coal Mining Co., at the Greenwich Piers, Philadelphia. Please inform the bureau as soon as you know definitely the date she will be ready to report for loading."

February 4th the government wrote Berwind-White. Coal Mining Company, which Company. was to do the loading, as follows:

"(1) The bureau has entered into contract with Messrs. De Groot & Peck, of New York, to transport about 2,000 tons best quality Standard Eureka coal from Philadelphia to the coaling station Sangley Point, P. I., per American sailing ship Luzon.

"(2) This vessel will soon report for cargo, though the exact date is not known. You will be duly advised as soon as date is fixed.

"(3) Please be prepared to give prompt dispatch, and, if any unforeseen circumstances occur to prevent this, notify the bureau.

"(4) Please consign cargo to commandant, Naval Station, Cavite, P. I."

That company accepted the order as follows:

"We are in receipt of your favor of the 4th inst., and note that the bureau has chartered the sailing ship Luzon to load about 2,000 tons Standard Eureka coal at Philadelphia for Sangley Point, P. I. We also note that the vessel will soon report for cargo, but that you will advise us exact date. We will, as you request. notify the bureau should circumstances be such that we cannot give the vessel prompt dispatch. We will consign the cargo to the commandant, Naval Station, Cavite, P. I."

February 18th, two weeks later, De Groot & Peck wrote:

"The ship Luzon under contract to you, to load coal at Philadelphia for Manila, Phil. Is., is now at pier No. 30 South Wharf, Delaware avenue, Philadelphia, and is ready for cargo."

No reply being received, they wrote again February 23d:

"We wrote you on the 18th inst., tendering ship Luzon you, now at Philadelphia, as ready for cargo. As we have no acknowledgment from you of its receipt, and thinking it may have miscarried, we write to ask if you have received this letter, as you should have received it on the 20th inst."

But February 20th the government had telegraphed Berwind-White Coal Mining Company as follows:

"Please load Luzon. Now ready. Do not waive dry coal."

February 21st that company replied as follows:

"We beg to acknowledge receipt of your telegram, and confirmation of Feb. 20th, as follows: 'Please load Luzon, now ready. Do not waive dry coal.'"

February 24th the Government replied to De Groot & Peck.

"Consign Luzon Berwind-White Coal Mining Co., Greenwich Piers, Philadelphia, for loading. They have been notified."

March 8th De Groot & Peck wrote:

"According to your telegraphic instructions, Captain Pach of our ship Luzon has been applying to the Berwind-White Coal Mining Co. at Philadelphia regarding the loading of his vessel, under contract to you. This morning we received the following word from Captain Pach: 'That the Berwind-White Coal Co. have received no instructions to load ship Luzon.' Our vessel is and has been ready for loading since we tendered her to you on the 18th of February, 1905."

March 9th the government telegraphed the Berwind-White Company, as follows:

"Luzon ready to load since February eighteenth. Why do you not load her?"

The same day, March 9th, the government wrote De Groot & Peck as follows:

"(1) The bureau is in receipt of your letter of the 8th instant stating that the ship Luzon is now ready to load, and has been since the 18th of February; and that according to telegraphic information from Captain Pach, of the ship, the Berwind-White Coal Mining Co., at Philadelphia, have received no instructions to load her.

"(2) On February 4th the bureau informed the Berwind-White Company of the charter of the ship Luzon, and stated that she would soon report for cargo, requesting that the necessary steps be taken to give her prompt despatch.

"(3) On receipt of your letter of the 18th of February, the bureau telegraphed the Berwind-White Company that the Luzon was ready to load, and requested them to load, but with dry coal. The bureau does not consider, in view of the long distance the cargo is to be transported, that it is a safe proposition to load wet coal in her. The matter of the delay in loading her will be taken up with the Berwind-White Company at once."

The coal was loaded by the Berwind-White Company, commencing March 11, 1905, and was completed March 16, 1905. March 20th De Groot & Peck filed the claim in question, subsequently corrected. It was disallowed. January 9, 1905, the government made a contract with the Berwind-White Company for 10,000 tons of coal "for immediate use, * * * to be delivered f. o. b. at the piers at Philadelphia, Pa." As matter of fact, it was to be dry coal. It would be highly improper and unsafe to ship such a quantity of bituminous coal as the Luzon was to carry except in a dry condition, on account of liability to spontaneous combustion. During the delay on the part of the Berwind-White Coal Mining Company in loading the Luzon a representative of the petitioners called several times to ascertain the cause

152 F.—34

of the delay, and was informed, in substance, it had no instructions. In truth, the company did not have sufficient dry coal to load the ship. From this statement of the facts it is evident that the defendant, the United States, was in no way negligent or at fault in the premises. The United States advised the Berwind-White Company in advance of the shipment to be made and had contracted for the coal. So soon as it knew the Luzon was ready to take on cargo, it notified that company. What more was required? What more could it have done? Having made the contract to deliver the coal, and have it ready for shipment, etc., the Berwind-White Company was bound to comply with the terms of its agreement unless relieved by some act of God, for which not responsible. It is also evident that the coal contractor, Berwind-White Coal Company, was wholly responsible for the delay in loading after the Luzon reported for that purpose. It is quite certain that on account of snows, wet weather, and delays in transportation, not within the control of the Berwind-White Company, that company was unable to have on hand sufficient dry coal for loading the Luzon at the time she reported for that purpose.

The question is this: Whether or not, under such circumstances and conditions, the government is liable to the petitioners for the delay in loading. Is the government liable for the delay of its agent the Berwind-White Company? Is the Berwind-White Company, under all the circumstances, liable to any one for the delay? No time was fixed by the charter party for the loading to begin or end, and there was no provision the Berwind-White Company should pay damages or demurrage arising from delay in loading. There was no time fixed by the contract between the United States and Berwind-White Company when it would commence to load any vessel. The law in such cases will presume a reasonable time under all the circumstances known to the parties or presumed to have been within their contemplation was intended, and a provision for such reasonable time will be considered as agreed to by the parties. Donnell et al. v. Amoskeag Mfg. Co.. 118 Fed. 10, 12, 55 C. C. A. 178; Scrutton Charter Parties (4th Ed.) 74, 244; Carver on Carriage by Sea (4th Ed.) § 610; American & Eng. Ency. of Law (2d Ed.) p. 222, and cases cited. This rule is fundamental and old. In the absence of some agreement to the contrary between owner and charterer or some evidence showing a contrary intent, the party who is to load the vessel will be deemed the agent of the charterer. When the charterer of such a vessel, in the absence of an agreement to the contrary, consigns same to a party named for loading, it makes itself responsible for the acts or omissions of such consignee the same as though it had directed the vessel consigned to itself at the same place. Donnell et al. v. Amoskeag Mfg. Co., 118 Fed. 10, 11, 55 C. C. A. 178; Am. & Eng. Enc. of Law, p. 224, and cases cited. And see Benson v. Atwood, 13 Md. 20, 71 Am. Dec. 611. The petitioners had no control over the Berwind-White Company with which the government had its contract to load the coal, and the government did not exempt itself from liability for delay in loading, and as a necessary consequence the government, and not that company, is liable to the petitioners for any delay beyond a reasonable time for loading.

The excuse for the delay in loading offered by the Berwind-White Coal Mining Company is set forth by it in a letter to the Navy Department, Bureau of Equipment, under date of March 10, 1905, as follows:

"Berwind-White Coal Mining Co.

"New York, March 10, 1905.

"Bureau of Equipment, Navy Department, Washington, D. C.—Dear Sirs: Regarding your message and letter of yesterday, we regret exceedingly the delay of the ship Luzon in Philadelphia, but our failure to load her has been caused by conditions entirely beyond our control. We were under the impression that the bureau were made aware of the conditions brought about by the interruption of traffic on the Penn. R. R.; thus obliging us to keep vessels waiting from three to four weeks. We are still short of coal, but we hope to be able to commence loading the ship Luzon in Philadelphia tomorrow, and you may be assured that everything possible will be done by us to dispatch the cargo at the earliest possible date. The S. S. David was also delayed by the great scarcity of coal. We would explain that we have ample facilities for loading vessels in Philadelphia, but that the Penna. R. R., for some months past, have been unable to transport our coal in sufficient quantities from our collieries to meet our requirements.

"Very truly yours,                Berwind-White Coal Mining Co."

These facts, if true, and I assume their truth, do not excuse that company or exonerate the government from liability to the petitioners. Hagerman v. Norton (C. C. A. 5th Circuit) 105 Fed. 996, 46 C. C. A. 1, and cases cited in note thereto; Manson et al. v. N. Y., N. H. & H. R. Co. (C. C.) 31 Fed. 297, and cases there cited; 9 Am. & Eng. Enc. of Law, p. 244, and cases cited. The charterer, not having exempted itself from responsibility for delays resulting from such causes, must be deemed to have assumed the risk. See cases cited.

The rule is, on the whole, just. The charterer contracts with the carrier to be at a certain place at a certain day, there to take a cargo in due course, and proceed on his voyage. He is advised that his vessel will be loaded by the agent of the charterer, or, what is the same thing, by a person with whom it has contracted. Over this contractor the carrier has no control whatever. For the contractor's acts of commission or omission the carrier is in no way responsible. It assumes no risk in that regard except by special provision of the contract. The carrier has the legal and moral right to expect that the cargo will be ready and put on board with reasonable dispatch. The charterer in legal effect contracts that it will be. It must answer if it is not ready, and put on board and assumes all risks of delay not caused by the fault of the carrier. The case is similar to that of the hiring of an employé by the day, or by the week, with directions to report and commence work on a day certain. If the person reports, it is immaterial that it rains or snows, or that other employés of the hirer have not furnished material to enable the work to go on. Such contingencies must be provided for in the contract of hire.

The next question is: What was a reasonable time for loading under all the circumstances of this case? The United States at first expected to ship the coal, but a portion of large quantities, in January, 1905. At the request of the petitioners, who could not be ready, it waived this and accepted tender for "February loading." This meant any time in February. The government informed its agent, Berwind-White Company. It asked to be advised when the Luzon

would be ready. Neither the government nor the Berwind-White Company could be expected to be ready on a moment's or a day's notice. Both were entitled to reasonable time after notice. Weather conditions; condition of coal; supply of coal on hand fit for such a shipment; these and other considerations were to be taken into account, and were within the contemplation of all the parties necessarily. The petitioners had no right to expect the Berwind-White Company would keep 20,000 tons of coal in readiness for them all through February. When they were ready, the company had the right under the circumstances stated to a reasonable time in which to prepare itself. It will be noted that the government did not direct De Groot & Peck to consign the Luzon to the Berwind-White Company until February 24th, and I do not think it is chargeable with unreasonable delay in not consigning her earlier. Business in the offices of the departments at Washington is often congested, and such matters must take their turn in routine work. The bureau having this matter in charge had been waiting the convenience of De Groot & Peck for 18 days, and I do not think a delay of 6 days was at all unreasonable under the circumstances.

I do not find any evidence that the government was advised of any delay on the part of the Berwind-White Company between February 24th and March 8th. Still De Groot & Peck had been directed to have the ship presented at the Berwind-White wharves for loading; and the question is: When did she present herself for that purpose? Mr. Park, the master of the Luzon, went to Philadelphia early in February to see to the repairs, and was there about a week. During that time, he says, he was informed by the Berwind-White people they had no instructions. This was true in a sense, as they had not been specifically directed to load the Luzon, and, indeed, she was not at that time ready for loading. Park went back to New York, or home, and on the 24th or 25th was directed by De Groot & Peck to return to Philadelphia. He reached there the 27th. He says that telephonic communications with the Berwind-White people were then had, but no definite information was obtained until March 7th. The ship was then at the South Wharf, but she had been trying to get orders since the 27th of February. March 7th the ship was taken to the Greenwich Pier for loading. In view of the directions to the Berwind-White Company on the 20th of February and the consignment of the ship on the 24th to the company, and its readiness on the 27th to go to the wharf and commence loading, and the failure of the Berwind-White Company to accept her and commence the loading, there was unreasonable delay and want of reasonable dispatch from and after the 28th day of February up to and including the 10th day of March, a period of 10 days, for which the company was responsible, and for which consequently the government as charterer was and is responsible. The damages in such a case are not strictly demurrage; there being no provision in the charter party for demurrage in case of such a delay, but damages in the nature of demurrage are allowable and recoverable. It is true no day was fixed on which to commence the loading in the proposal and acceptance, but the day was fixed as the 28th by the subsequent acts and correspondence of the parties just

recited. In law and equity it is the same as though that day had been specifically named in the proposal and acceptance. The rule of vis major does not apply here to exonerate the Berwind-White Company or the government. The facts recited in the letter of Berwind-White Company to the government do not bring the case within the rule. The case of Crossman v. Burrill, 179 U. S. 100–113, 21 Sup. Ct. 38, 45 L. Ed. 106, is instructive on this point as are the cases there cited and commented upon. Mr. Justice Gray, in delivering the opinion of the court, said:

"In the case at bar the defense of vis major, as pleaded in the answer, was that the shipowners were prevented from discharging the cargo, and the charterers were prevented from receiving it, any sooner than they did, by reason of acts of the public enemy, to wit, certain vessels of war, then in the harbor of Rio Janeiro, were engaged in firing upon the forts in the harbor and in making war upon the government of Brazil; that the firing between those vessels and those forts made it impossible to discharge or to receive the cargo from the vessel any sooner than it was discharged or received; and that the detention alleged in the libel was caused by those acts of the public enemy, and not by any default of the charterers. The vis major, so pleaded, was, in the words of opinions above cited, a 'superior force, acting directly upon the discharge of the cargo'; 'a direct and immediate vis major'; and 'unusual and extraordinary interruption that could not have been anticipated when the contract was made'; 'a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers'; and an 'interference on the part of an armed force, preventing the handling or moving of the cargo.' Upon principle, and according to the general current of authority, the detention alleged was not caused by default of the charterers, and did not render them responsible for demurrage, under this charter party."

But here the delay of the railroad company in transporting and delivering coal was not the act of "a public enemy," nor was it a superior force acting directly upon the loading of the coal, a force and contingency not within the contemplation of the parties when the contract was made. On the other hand, the delay in loading was indirectly caused by the operations of nature, rains, snows, storms, etc., all of which are liable to occur, and the occurrence of which must be presumed to have been within the contemplation of the parties. The government took the chances and assumed the risks of all these operations of nature, not having provided for nonliability in case of their intervention. And I find nothing in the contract between the government and the Berwind-White Company on that subject, except that the "coal must be of the best quality run of mine with fair proportion of lump, dry and free from slate," etc. This case is not within Corrigan et al. v. Iroquois Furnace Co., 100 Fed. 870, 41 C. C. A. 102, as the Luzon was chartered January 3, 1905, for one cargo only of the February loading, and was subsequently consigned by the government for loading at a time certain, and the owners did not contract with reference to delays of government contractors in supplying coal to it. They are, however, presumed to have known the government did not own railroads or mines, and were dependent on contractors for its supply. But they had the right to assume the government would have coal ready for loading within a reasonable time after notice that the Luzon was ready, and especially on receiving notice to report for loading.

But it is contended by the government that the Berwind-White Company was not in legal effect its agent for the loading of the Luzon; that the company was an independent contractor and the agent of both parties. I do not regard this contention as sound. The government contracted with the Berwind-White Company and selected it to do the loading for the government. The government had contracted to do the loading and the petitioners had no control of the agent selected by it.

I think the evidence establishes that the damage in the nature of demurrage were fairly $80 per day, and I so find, making the total amount which petitioners are entitled to recover $800.

There will be judgment for that sum.