## MENCKE *v.* CARGO OF JAVA SUGAR.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 90. Argued November 13, 1902.—Decided December 1, 1902.

Where the charter party of a vessel bound with a cargo of sugar from Java, to a port in the United States provides that the vessel should discharge at New York, Boston, Philadelphia or Baltimore " or so near the port of discharge as she may safely get and deliver the same, always afloat, in a customary place, and manner, in such dock, as directed by charterers, agreeably to bills of lading," and also provides "all goods to be brought to and taken from alongside of the ship always afloat at said charterers' risk and expense, who may direct the same at the most convenient anchorage; lighterage, if any, to reach the port of destination, or deliver

the cargo at port of destination, remains for account of receivers, any custom of the port to the contrary notwithstanding," and the vessel has three steel masts built up solidly from the bottom to the top and so riveted there is no way of taking them down and the mainmast requires one hundred and forty-five feet of clear space to pass under any obstruction, which is more than the height at dead low water of the Brooklyn Bridge over the East River, charterers have no right to order the vessel to discharge at a dock above the Brooklyn Bridge; and if the vessel discharges by lighterage from the most convenient place below the bridge, the charterers must pay the expense of lighterage from the vessel to the dock. Under the above conditions it is not a just exercise of the right given to the charterers by the charter party to select a dock in getting to which the vessel could not always be afloat or to which she could not safely get. Under such circumstances the vessel is not obliged to sail around Long Island and thus reach the dock above the bridge by coming through Long Island Sound and Hell Gate.

THIS action was begun by the filing on May 27, 1899, of a libel in the United States District Court for the Eastern District of New York, by Anton Mencke, the master of the British ship Benlarig, against a cargo of sugar that had just been delivered from the vessel, to recover an unpaid balance of freight due for conveying the sugar from Java to New York. The receivers of the cargo, the claimants in the action, had deducted from the freight the cost of lightering the cargo from the dock where it had been discharged to the claimants' refinery, which was above the Brooklyn Bridge. The ship had been ordered by the claimants to proceed directly to the refinery, but was unable to do so because the height of her masts was such that she could not pass under the bridge.

The District Court, per Judge Thomas, entered a decree in favor of the libellant January 18, 1900. 99 Fed. Rep. 298. The claimants appealed to the United States Circuit Court of Appeals for the Second Circuit, and that court on April 16, 1901, reversed the decree of the District Court, and remanded the cause with directions to dismiss the libel. 108 Fed. Rep. 89.

On May 13, 1901, a writ of certiorari was granted, and the cause was brought to this court. 181 U. S. 620.

*Mr. J. Parker Kirlin* for petitioner. *Mr. Charles R. Hickox* was with him on the brief.

*Mr. Wilhelmus Mynderse* for respondents.

Mr. Justice Shiras delivered the opinion of the court.

Concerning the facts of the case there is no controversy.

The ship Benlarig was chartered under a charter party dated London, July 1, 1898, between Watson Brothers, her owners, and Erdmann & Sielcken, merchants of Batavia.

The vessel duly loaded a full cargo of sugar at Java, and then proceeded to Barbadoes. There she received orders to proceed directly to New York. This she did, arriving on or about April 14, 1899. Before or about the time of the arrival of the Benlarig at the port of New York the cargo of sugar was sold and transferred, with the accompanying bills of lading, by the owners and consignees thereof, to Arbuckle Brothers, sugar refiners. The agents of the vessel gave notice to Arbuckle Brothers, on April 15, of the arrival of the vessel, and asked for orders for a discharging berth, mentioning that the vessel's mast, being in one piece, would not admit of her going under the Brooklyn Bridge. Arbuckle Brothers ordered the vessel to discharge at their refinery at the foot of Pearl street above the bridge. Subsequently it was agreed that the cargo should be discharged at the West Central Pier, Atlantic Dock, below the bridge, into lighters provided by Arbuckle Brothers, without prejudice to the rights of either party in respect to the payment of the cost of lighterage. This cost amounted to $1466.12, which was paid by Arbuckle Brothers and deducted by them from the freight; and this suit is to recover the balance of the freight so deducted.

The clear height of the highest span of the Brooklyn Bridge above mean high water is one hundred and thirty-five feet. At dead low water there were not more than one hundred and forty feet in the clear at the highest point.

The Benlarig has three steel masts, built up solid from the bottom to the top, and constructed of cylindrical steel plates, riveted together with internal angle iron braces. There was no way of taking any part of the masts down. The mainmast was one hundred and thirty-nine feet ten inches above the deck;

the foremast one hundred and thirty-six feet eight inches above the deck; and the mizzenmast was one hundred and twenty-nine feet above the deck; and the deck was from seven to eight feet above the loadline of the vessel. The ship, therefore, required one hundred and forty-five feet of clear space in order to pass underneath the bridge. This was more than five feet in the clear of the highest point of the bridge when the tide was at the lowest point of the ebb. An additional margin of several feet would have to be allowed for safe passageway; and at the lowest water the Benlarig could not pass under the bridge without cutting off some eight to ten feet of her steel masts.

The charter party provided that the Benlarig should load at Java and should proceed to Barbadoes, "thence to Queenstown or Falmouth, (as directed by charterers or their agents,) for orders to discharge, always afloat, either at a safe port in the United Kingdom or on the continent of Europe between Havre and Hamburg (both included), Rouen excepted, or at option of charterers to order vessel from Barbadoes to proceed to Delaware Breakwater for orders to discharge at New York or Boston or Philadelphia or Baltimore, or so near the port of discharge as she may safely get and deliver the same, always afloat, in a customary place and manner, in such dock, as directed by charterers, agreeably to bills of lading." Section 4 of the charter party further provided that "All goods to be brought to and taken from alongside of the ship, always afloat, at the said charterers' risk and expense, who may direct the same at the most convenient anchorage; lighterage, if any, to reach the port of destination, or deliver the cargo at port of destination, remains for account of receivers, any custom of the port to the contrary notwithstanding."

Four bills of lading were issued at the ports of loading, reciting the "shipment of the sugar, and containing the identical conditions that the sugar was to be delivered in the like order and condition at the port of discharge as per charter party dated London, 1st July, 1898, (the dangers of the sea excepted,) unto Messrs. Winter & Smillie as agents, or to their assigns, he or they paying freight for the said sugar as per charter party.

General average, if any, to be settled according to York-Antwerp rules, 1890. All other conditions and exceptions, negligence and Harter Act clauses included, as per charter party above referred to, with average accustomed."

The positions of the respective parties may be briefly stated thus :

The libellant's contention is that, under clause 1 of the charter party, the right of the charterers or their assigns to select the dock for the discharge of cargo was subject to the limitation that such dock must be one that was safe and suitable for the ship as well as for the cargo, and one to which the ship could proceed without hindrance by permanent obstacles, which she could not pass without being mutilated, crippled or dismantled; and that, under clause 4 of the charter party, any lighterage necessary to deliver the cargo at the port of destination must be paid by the charterers.

The claimants contend that the discharging berth to which the Benlarig was ordered was safe for vessels of her class, and a customary place of discharge; and she should have proceeded there, or should have delivered her cargo there otherwise at her own expense; and that the lighterage clause of the charter party does not relieve the owners of the ship from their obligation to proceed to a designated dock above the bridge, and to there deliver the cargo.

Another suggestion made on behalf of the claimants, namely, that the Benlarig, though unable to pass under the bridge, might have reached the Arbuckle dock by sailing around Long Island, and then through the Sound and Hell Gate to Brooklyn, should be first disposed of. It is, perhaps, sufficient to say that no such allegation appears in the claimants' answer. Nor did the claimants'-assignments of error to the judgment of the District Court raise any such question. Neither did the claimants, during the negotiations, make any such suggestion. Moreover, the District Court and the Circuit Court of Appeals agreed in the statement that " all shipping experts called by the claimants testified that they had never heard of a ship from Java pursuing that course, and it may therefore be concluded that such alternative was contrary to the expectations and under-

standing of all parties to this contract, or of any other contract for the carriage of sugar from Java."

The question that remains is, upon which of the parties the expense of the lighterage should fall. The answer, we think, must be found in a proper construction of the contract between them.

It cannot be fairly claimed under the evidence that the expense that would have been occasioned to the owners of the vessel, if they had removed or taken down the mast, would have been trifling or inconsiderable. There was some evidence that, in a few instances, the topmasts of vessels had been taken down in order to permit them to pass under the bridge, and that the expense in each case was small. But those were cases of vessels with wooden masts, so constructed as to permit the topmast to be lowered. The Benlarig's masts were wholly of steel, and the testimony of her master was that if it became absolutely necessary to make the vessel pass beneath some obstruction lower than the top of the masts, the masts would either have to be cut or removed wholly out of the ship. What cost would have been caused by cutting or removing the steel mast does not appear. But the courts below concurred in regarding the mutilation or destruction of the ship's masts as a serious affair.

In such a condition of affairs we think that resort to lighterage was natural and reasonable and within the obvious and fair import of the terms of the charter party. The clause, which is claimed to give the charterers or their assigns the right to appoint the dock in which to discharge cargo contains conditions that the port must be safe, and that the vessel must discharge always afloat, either at a safe port or so near the port of discharge as she can safely get. It would not be a just exercise of the right to select a dock in getting to which the vessel could not always be afloat or to which she could not safely get. A ship could not be said to be afloat, whether the obstacle encountered was a shoal or bar in the port over which she could not proceed, or a bridge under or through which she could not pass; nor could she be said to have safely reached a dock if required to mutilate her hull or her permanent masts.

Any doubt that might be felt as to this construction of the clause will be relieved by the express language of section 4: " All goods to be brought to and taken from alongside of the ship, always afloat, at the said charterers' risk and expense, who may direct the same to the most convenient anchorage ; lighterage, if any, to reach the port of destination, or deliver the cargo at port of destination, remains for account of receivers, any custom of the port to the contrary notwithstanding." Here, again, is recognized the right of the ship to be " always afloat." The anchorage directed must be the "most convenient; " which must mean convenient as well for the ship as for the consignees ; and, finally, if lighterage is necessary, either to reach the port or to deliver the cargo, the expense thereof is chargeable to the receivers of the goods, regardless of any local port customs.

We do not feel constrained to go into an extended consideration of the authorities cited in the briefs of counsel, but shall refer to two or three cases which, in some of their features, seem to be applicable.

The case of *The Alhambra*, L. R. 6 P. Div. 68, was where the charter party provided that the vessel should go " to a safe port in the United Kingdom, . . . or as near thereunto as she could safely get, and always lay and discharge afloat . . . lighterage, if any, always at the risk and expense of the cargo."

The charterers gave orders to the vessel to proceed to Lowestoft and there discharge the cargo. The average high water in that harbor was about sixteen feet, and average low water about eleven feet. The master objected to discharging in Lowestoft harbor, notwithstanding that the purchasers of the cargo gave him notice that they were prepared at their own expense to lighter the vessel in Lowestoft Roads sufficiently to enable her to lie always afloat in Lowestoft harbor, if necessary, should her draught of water so require. The vessel went to Harwich as the nearest safe port and there discharged the cargo. The owners of the cargo brought suit for breach of contract, and offered evidence to show that it was the custom of vessels which were too deep to enter the port of Lowestoft to discharge

a portion of their cargo in the roads outside, and that it could be done with reasonable safety. The cargo owners recovered a judgment, but the Court of Appeals reversed, that court holding that Lowestoft was not a safe port for the vessel within the meaning of the charter party, and that the custom shown by the charterers was inadmissible.

This case was cited with approval by this court in *The Gazelle*, 128 U. S. 474, where the charter party provided that the vessel should proceed from Baltimore "to a safe, direct, Norwegian or Danish port, as ordered on signing bills of lading, or as near thereunto as she can safely get, and always lay and discharge afloat."

The charterers tendered to the master for signature bills of lading, ordering the vessel to the port of Aalborg, in Denmark, as the port of discharge, "to be landed at Aalborg, or as near thereto as the vessel can safely get." The master refused to sign the bills of lading for the reason that Aalborg was not a safe port. Aalborg is situated in Denmark on the Limiford Inlet, about seventeen miles from its mouth. Owing to a bar at the mouth of the Inlet, there was a depth of water of only ten or eleven feet. The draft of the Gazelle loaded was about sixteen feet. The only place of anchorage for a vessel that cannot cross the bar is off the mouth of the Inlet, where vessels were accustomed to discharge into lighters. Thereafter the master filed a libel for demurrage in the District Court of the United States for the District of Maryland, whose judgment, sustaining the libel and dismissing the cross-libel of the charterers, was affirmed by the Circuit Court. This court said, through Mr. Justice Gray :

"By the express terms of the charter-party, the charterers were bound to order the vessel 'to a safe, direct, Norwegian or Danish port, or as near thereto as she can safely get and always lay and discharge afloat.' The clear meaning of this is that she must be ordered to a port which she can safely enter with her cargo, or which, at least, has a safe anchorage outside where she can lie and discharge afloat. *Dahl* v. *Nelson*, 6 App. Cas. 38 ; *The Alhambra*, L. R. 6 P. Div. 68. The charterers insisted upon ordering her to the port of Aalborg. The Circuit Court

has found that Aalborg is in a fiord or inlet having a bar across its mouth, which it was impossible for the Gazelle to pass, either in ballast or with cargo ; and that the only anchorage outside the bar is not a reasonably safe anchorage, nor a place where it is reasonably safe for a vessel to lie and discharge."

The charterers offered evidence to show that by the custom of trade between Baltimore and the Atlantic ports and the ports of Norway and Denmark, Aalborg was recognized as being, and understood to be, a safe, direct port of Denmark, within the meaning of the charter party. In respect to which this court said : " Evidence of a custom to consider as safe a particular port, which in fact is not reasonably safe, would directly contradict the charter-party, and would therefore be incompetent as matter of law."

In *In re an Arbitration between Goodbody & Co. and Balfour, Williamson & Co.*, 4 Com. Cas. 119, the facts were that a cargo of wheat per the ship Vanduara had been sold in a contract containing the clause "shipped . . . per Vanduara . . . sailed or about to sail as per bill or bills of lading dated, etc., . . . . to any safe port in the United Kingdom of Great Britain, or to Havre or to Dunkirk or to Antwerp, calling at Queenstown, Falmouth, or Plymouth, for orders, as per charter party. Vessel to discharge afloat." The vendees declined to take the papers on the ground that by the bills of lading the cargo was stated to have been shipped upon the Vanduara " to discharge at a safe port in the United Kingdom, Manchester excepted," and that such bills of lading did not comply with the contract for delivery in any safe port in the United Kingdom. It was found in the special case stated for the decision of the court that " the Vanduara when loaded with the said cargo would have been unable to go up the Manchester Ship Canal to the Manchester Docks, because the heads of her lower main and mizzenmasts would have been higher than the limit fixed by the canal company's regulations for passing under the Runcorn Bridge."

The vendors argued that the addition to the bills of lading of the words, " Manchester excepted," was immaterial, inasmuch as Manchester, in any event, was not a " safe port " in the sense

of the bills of lading, as the ship could not reach it without cutting off or taking down her masts; and of that opinion were the Divisional Court and the Court of Appeal, 5 Com. Cas. 59, A. L. Smith, L. J., in the latter court saying, "it is abundantly proved that Manchester taken by itself was not a safe port for this vessel, because it was found as a fact .... that it would have been necessary to dismantle the ship to enable her to get under Runcorn Bridge, which is the first bridge vessels going up the canal to Manchester have to pass." Collins, L. J., was of the same opinion. And Vaughn Williams, L. J., said: " On the findings of the last award it is perfectly plain that in a commercial sense the port of Manchester does not extend beyond Runcorn Bridge. It is not disputed that Manchester in that sense was not a safe port for the Vanduara to go to."

This case is pertinent as holding that an overhead bridge which prevents access to the place designated for the discharge quite as effectively renders it unsafe for the ship as a sandbar or other obstacle under the water.

The view of the Circuit Court of Appeals, that the construction put upon the charter party by the District Court was within its letter but not within its spirit, because " an application to novel circumstances of clauses intended for a different set of circumstances," we cannot accept. We are unable to see anything in the undisputed facts of the case that warrants any other construction of the language employed than that suggested by its ordinary meaning.

*The decree of the Court of Appeals is reversed, and the decree of the District Court is affirmed with interest thereon from the time of its entry.*