## THE SKOMVAER. AKTIESELSKABET CHRISTIANSSAND v. W. R. GRACE & CO. W. R. GRACE & CO. v. AKTIESELSKABET CHRISTIANSSAND.

(Circuit Court of Appeals, Second Circuit. January 7, 1924.)

No. 123.

1. **Shipping** ⊙⇒181—**Lay days run from time of notice, though charterer began to load earlier.**

Where charter party provided that lay days should "count from the time the captain gives notice," and the captain in fact gave notice as soon as the ship was ready, the lay days began to run from the time of such notice, though charterer began to load vessel several days prior thereto.

2. **Time** ⊙⇒10(10)—**Sundays, etc., not counted in computing lay days.**

In computing lay days, Sundays and legal holidays are excluded, and whole days only, and not fractions, are counted.

3. **Shipping** ⊙⇒181—**Notice to charterer as affecting lay days need not be in any particular form.**

Under provision of charter party providing that lay days should count from time captain gave notice of readiness, a letter from the master of the vessel to charterer's agent, stating "that lay days shall commence on" specified date, was sufficient; no particular form being required.

4. **Notice** ⊙⇒12—**Under contract construed according to intent.**

A notice given under a contract providing therefor must be construed according to the intention of the parties to the contract.

5. **Shipping** ⊙⇒35—**Time for beginning of lay days cannot be altered by master.**

Where charter party defines the time when the lay days shall begin to run, the master has no authority to alter it.

6. **Shipping** ⊙⇒181—**Notice as affecting lay days, given before ship had discharged, ineffective.**

Under charter party providing that lay days shall begin to run when master gives charterer notice, a notice given before the ship was ready for loading and had finished discharging would have been ineffective.

7. **Shipping** ⊙⇒181—**Sailing ship not ready to receive cargo until able to stand up and previous cargo discharged.**

A sailing ship, to be ready to receive cargo, so that lay days may commence to run, must be able to stand up, and must have discharged her cargo from all her holds, so that the charterer may have the disposal of the whole of the vessel, or as much thereof as he is entitled to under the charter, since until the ship is in such condition there is no obligation on the part of the charterer to begin to load.

8. **Shipping** ⊙⇒181—**Storms do not stop running of lay days.**

The fact that loading is interfered with by storms does not prevent the running of lay days.

9. **Shipping** ⊙⇒181—**Days on which repairs were made were not "lay days."**

Days on which a ship was being repaired were not lay days for purpose of determining demurrage, the ship not being ready to receive the cargo on such days.

10. **Shipping** ⊙⇒181—**Days on which vessel failed to keep winch in order not excluded in computing lay days.**

The mere fact that vessel had failed to keep winch in order as required by charter party did not justify exclusion of days on which winch was not in order from number of lay days, in the absence of a showing that loading and discharging were interfered with thereby; the charterer in such case having the burden of proving the time actually lost.

11. **Shipping** ⊙⇒181—**Time unloading stopped for stiffening held not lay days.**

The time during which unloading of cargo was stopped to enable the owner to take on new cargo from a lighter as stiffening for another

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

voyage, with which the charterer was not concerned, was not lay days for which charterer was liable for demurrage, notwithstanding provision of charter party providing, "vessel to move to such loading and discharging berth or berths as charters may direct where she can lie safely afloat."

12. Shipping ☞50—Charterer held liable for towage; "port charges, including towage."

Where charter party for voyage from Brazil to the port of Philadelphia made a charterer liable for all "port charges, * * * including * * * towage," the charterer was liable for a charge incurred in towing the ship from the mouth of Delaware Bay to her discharge dock in Philadelphia, since the agreement to pay "port charges * * * including * * * towage," obligated charterer to pay towage begun outside the port, which was necessary to enable the vessel to enter the port.

Appeals from the District Court of the United States for the Southern District of New York.

Libel by the Aktieselskabet Christianssand, owner of the bark Skomvaer, against W. R. Grace & Co., a corporation, in which the respondent W. R. Grace & Co. filed a cross-libel against libelant. From the decree rendered (286 Fed. 711), both parties appeal. Remanded, with directions.

Haight, Smith, Griffith & Deming, of New York City (Clarence Bishop Smith, of New York City, of counsel), for owner of the Skomvaer.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating and James H. Herbert, both of New York City, of counsel), for W. R. Grace & Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is a libel and cross-libel arising out of disputes between the owners and charterers of a vessel. The charter party bears date of September 20, 1918. It was for the carriage of a cargo of manganese ore. The owner of the vessel is a corporation organized under the laws of the kingdom of Norway, and is the owner of the Norwegian bark Skomvaer, and the charterer is a corporation organized under the laws of the state of Connecticut, with an office and place of business in New York City.

The libel, as amended by an order entered after trial and the court's opinion, claimed 19 days' demurrage was incurred. It admitted 3½ days' demurrage was originally paid by the charterer. It sought to recover, therefore, 15½ days demurrage at $528 per day. The answer denied that any demurrage was due to the libelant, and it further alleged that the charterer advanced for the account of the owners $1,000, for towing the bark from the Delaware Breakwater to the port of Philadelphia and $1.51 consular fees, which sums have not been refunded by the owners; that the libel should be dismissed, and that the charterer is entitled to recover the sum of $2,849.51, which represents the 3½ days' demurrage paid by mistake and the advances made for towage and consul fees.

The charterer filed a cross-libel, setting forth the claims asserted in its answer. To this cross-libel the owners filed an answer, denying all of the material allegations.

· The court ordered, adjudged, and decreed that Aktieselskabet Christianssand, libelant and cross-respondent, recover of and from W. R. Grace & Co., respondent and cross-libelant, the sum of $8,448.00, being 16 days' demurrage, and $2,993.08, unpaid charter hire, less $1,000 advanced for towage, and less $1,848, 3½ days' demurrage heretofore paid, making a recovery of principal of $8,593.08, together with interest thereon from the 30th day of January, 1919, to the date of entry of this decree, amounting to $2,077.46, together with costs as taxed in each of the above-entitled causes, amounting to $152.80, making a total of $10,823.34, which last-named sum it was adjudged was to bear interest until paid.

The owner of the vessel in its appeal claims that demurrage for 19 days should have been awarded, instead of for 16 days, and that the respondent appellant should not have been allowed an offset of $1,000, the cost of towing the bark Skomvaer from Delaware Breakwater to Philadelphia, a distance of 103 miles, which charge was paid by the charterer.

The charterer has filed a cross-appeal. It appeals from that part of the decision and final decree which awarded to the respondent cross-libelant below a recovery of $1,000, the cost of towing the bark Skomvaer from the Delaware Breakwater to the port of Philadelphia, a distance of 103 miles; and it also assigned for error that the court failed to find that the respondent was not guilty of any delays or default, and was not entitled to recover back the overpayment of 3½ days' demurrage which it was claimed had been paid by mistake.

The charter was for a voyage from Bahia, in Brazil, to a United States North Atlantic port, to be named on signing the bills of lading. The charterers named the port of Philadelphia. The charter is the "United States Shipping Board form under Norwegian sailing agreement." The owner, in its libel as' amended, asserted that there was due to it on account of charter hire and demurrage the sum of $8,798.-08. It alleged that it was entitled to one day's demurrage at the port of loading, and 13½ days' at the port of discharge, a total of 14½ days' demurrage.

It is agreed that the charterers were entitled to 20 lay days, Sundays and holidays excepted, and that the rate of demurrage was $528 a day. The charterers claimed that the boat had been loaded and discharged within the lay days granted them, and they asked the return of 3½ days' demurrage, which they asserted had been paid under a mistake of fact.

Article 14 of the charter party provided as follows:

"Cargo to be loaded at the average rate of not less than 250 tons per running day, Sundays and holidays excepted, and to be discharged at the average rate of 250 tons per running day, Sundays and holidays excepted, time reversible; i. e., any time saved at loading port to apply at port of discharge, charterers to have the privilege of working vessel on Sundays and holidays, if they so desire, provided they pay all extra expenses and overtime actually incurred by working cargo in connection with ship and cargo, Sundays and holidays so used not to count as lay days."

And article 13 of the charter party provides as follows:

"It is agreed that lay days for loading and discharging shall be as follows (if not sooner dispatched), commencing from the time vessel reaches loading

or discharging dock, or berth, if available, and master has filed written notice and all customs formalities have been complied with. In event of berth for loading or discharging not being available, lay days to count from the time captain gives notice of readiness to proceed to loading or discharging berth, vessel being duly entered and all other customs formalities complied with."

The only "notice" which the record discloses as having been given by the master is found in a letter which he addressed to the charterer's agent on October 11, 1918, in which he wrote as follows:

"In reply to your letter of even date, I beg to advise you that, on account of discharging of ballast has been delayed, I hereby agree to that lay days shall commence on Monday the 14th inst., 7 a. m."

It is clear that under article 13 of the charter party both parties agreed that the master was authorized to give notice of the ship's readiness to load or discharge and that the lay days were to count from the time he gave notice of readiness.

In 36 Cyc. 364, the rule is stated as follows:

"Where the contract is express as to the time the lay days are to commence, it controls, even though loading or discharging is actually begun before the stipulated time."

And in support of that proposition the decision of this court in Elder Dempster S. S. Co. v. Earn Line S. S. Co., 168 Fed. 50, 93 C. C. A. 472, is cited, in which it was determined that, when the parties to the contract have explicitly and without any reservation or proviso provided when the lay days shall begin, the express written agreement controls. It appears from the log of the ship that in the instant case the ship did not complete her discharge until 3 p. m. of October 11, 1918, and on that day the master gave the notice above mentioned.

In the instant case the entries in the ship's log show that she was discharging ballast in the main hold on October 7th, 8th, 9th, 10th, and 11th until 3 p. m. During those days the ship was not ready to load, and if she had been tendered the charterers would have been under no obligation to accept her and to commence to load her.

[1] It appears, however, that while the ship was not ready the charterers did load and put on board some of the cargo on October 8th, 9th, 10th, and 11th. On October 7th, while no loading was done, the entry in the ship's log is, "Also rigging loading gear for loading in aft hold." The court below has held that the lay days began on October 8th and continued for four days to the 12th, and the learned judge in so holding declared: "There can be no doubt" of it. We do not find ourselves able to concur in the conclusion he reached as to the time the lay days legally began; the time when they were to begin being stated in the charter party—"lay days to count from the time the captain gives notice." We do not agree that they began to run before he gave notice and before the ship was in readiness, even though some loading was actually done before the notice was given and before the ship was actually ready.

[2-4] Before October 11th no notice could have been given of readiness, because readiness did not exist as will more fully appear as we proceed. October 12th was Saturday, and October 13th was Sunday. In computing lay days Sundays and legal holidays are excluded, and

whole days only and not fractions of days are counted; and as notice must reach the charterer, and it does not appear that notice reached the charterer on Saturday, so that the whole of that day could be used in loading, we are not justified in holding that lay days began to run on that day, as against the statement in the notice that lay days would begin to run on Monday. The letter of October 11th may not have been in the usual form, but the form of the notice is not material, as no particular form is required. 268 Logs of Cedar, 2 Low. 378, Fed. Cas. No. 14,295; Carroll v. Holway (D. C.) 158 Fed. 328, 336. The letter of October 11th was sufficient to constitute notice in law and in fact. It is a general rule of law that a notice given under a contract must be construed according to the intention of the contract. Green v. Wilson, 21 N. J. Eq. 211.

The intention of these parties is disclosed by their express agreement that the lay days should count from the time the master gave notice of readiness, and as we have seen that agreement controls, even though loading began before notice was actually given. If that principle governs, as we think it does, it is immaterial whether the loading actually began one day or several days prior to the giving of the notice. And in Elder Dempster S. S. Co. v. Earn Line S. S. Co., 168 Fed. 50, 93 C. C. A. 472, this court, as already remarked, held that in such cases the written agreement controls. In that case the charter party expressly provided:

"Lay days at port of discharge to commence 24 hours after steamer's entry at custom house."

The steamship arrived at the discharging port on December 27th at 8:30 a. m., was entered at the custom house at 10 a. m. of the same day, and discharge commenced at once. The question was whether lay days began when the charterers commenced to discharge on December 27th, or on December 28th, at 10 a. m., 24 hours after entry at the custom house, and we held that lay days began to run, not from the time the vessel began to discharge, but on December 28th at 10 a. m., 24 hours after the entry at the custom house.

[5, 6] We agree that, if the charter party defines the time when the lay days should begin, the master has no authority to alter it. But we are unable to see that in this case he attempted to alter it. If he had given the notice before the ship was "ready," and had finished discharging, the notice would be ineffective. The notice in fact was given as soon as the ship was ready, and we think that the fact that some loading was done prior to the giving of the notice is to be disregarded in computing the lay days.

[7] We have, in what has been said, assumed that the ship was not in readiness prior to the giving of the notice on October 11th. The reason for that conclusion will now be stated. In our opinion a sailing ship to be ready to receive cargo must be able to stand up. She must be tendered as an upright ship and a discharged ship; otherwise, she is not ready for loading. This is made plain by Sailing Ship Lyderhorn Co., Limited, v. Duncan, Fox & Co., [1909] 2 K. B., 929. In that case on January 27, 1908, the captain gave notice that his vessel had discharged her coal cargo down to stiffening, and could

not discharge with safety after 5 p. m. of that day, and he asked the defendants to furnish 700 tons of nitrate stiffening as stipulated in the nitrate charter party. Lord Alverstone, Chief Justice, who decided the case in the court below, stated that the short point which had to be decided was whether when the captain gave notice that his vessel required the stiffening she was ready to load, and he added: "The point is one of considerable difficulty." But he held that the vessel was not ready to load. The case was taken to the Court of Appeals, which unanimously affirmed the Lord Chief Justice in holding the ship not "ready." Cozens-Hardy, M. R., in his opinion also declared that the appeal raised a question "undoubtedly of some difficulty." He then stated that:

"Upon the whole I have come to the conclusion that the interpretation the Lord Chief Justice has put upon it is correct."

He then proceeded as follows:

"When is a ship ready for loading? I think that the authorities really decide that, and I cannot put it better or more accurately than by using the language which has been adopted by counsel on both sides. It is this: That a vessel is not ready to load unless she is discharged and ready in all her holds, so as to give the charterers complete control of every portion of the ship available for cargo, except so much as is reasonably required for ballast to keep her upright. What does that mean in a charter party like this? The ship had to be, before January 31, tendered as an upright ship, a discharged ship ready for loading, in the sense which I have referred to. Moreover, she had to be a ship rendered upright and safe by being stiffened, not with ballast, not with coal, but with nitrate; that nitrate having to be provided by the charterers, as and when requested by the captain, to take the place of the coal which would have to be moved, but required and provided in such time and under such circumstances as to enable the ship to be discharged of all strange cargo on January 31, so that the charterers might be able to use every portion of the space of the ship and to stow their cargo in what manner they might think fit."

And Farwell, L. J., stating that he was of the same opinion, said:

"That means a vessel discharged in all her holds, and also with sufficient stiffening—that is, with sufficient ballast on board to keep her upright."

And Kennedy, L. J., stating that he was also of the same opinion, said:

"It is true, no doubt, that, in regard to a sailing ship, she must stand upright in order to be a ship at all, and take in cargo."

The rule is stated in Carver's Carriage by Sea (4th Ed.) § 221, as follows:

"The vessel is not 'ready to load,' within the meaning of such a clause, unless she is discharged and ready in all her holds, so as to give the charterer complete control of every portion of the ship available for cargo, except so much as is reasonably required for ballast to keep her upright."

And in Aktieselskabet Fido v. Lloyd Braziliero, 283 Fed. 62, this court held that a sailing ship is not ready to load until the necessary stiffening has been taken on board. Until that has been done she is not "ready," within the meaning of the charter party. We adhere to the above ruling, and are satisfied that a sailing ship is not "ready" until she has discharged her cargo from all her holds, so that the charterer may

have the disposal of the whole of the vessel, or of so much thereof as he is entitled to under the charter, and has on board the necessary stiffening. Until she is in that condition there is no obligation on the charterer to begin to load.

For the reasons stated, we think it was error to count as lay days, 'as the court below did, October 8th, 9th, 10th, and 11th. They did not begin to run until October 14th, as stated in the notice which the master gave.

[8] The entries in the log on October 28th state "No loading," and that a hard wind was blowing, so that two tugboats came at 3 p. m. to shift the vessel further into the harbor. But during the night loading went on in the main hold. 'This was properly counted as a lay day by the court below. The fact that loading is interfered with by storms does not prevent the running of the lay days. The Olaf (D. C.) 248 Fed. 807; Hagerman v. Norton, 105 Fed. 996, 46 C. C. A. 1; Hughes v. J. S. Hoskins Lumber Co. (D. C.) 136 Fed. 435; Wood v. Keyser (D. C.) 84 Fed. 692; Fish v. Brown Stone (D. C.) 20 Fed. 201; Pederson v. Engster (D. C.) 14 Fed. 422.

The entry on October 29th is:

"Loading main hold all day. From 7 a. m. to 10 p. m. trimming cargo in main hold. It is found that the barge that went adrift on the 27th has knocked a hole in the ship in front of the closet pipe; also several dents. Stopped loading. O'Brien, Fransesca, and Cross commencing service."

We cannot say that the court below was in error in including October 29th among the lay days.

[9] The entries show that on October 30th and 31st and on November 1st there was no loading, and the master testified that on those days it was necessary to suspend loading, as the ship was being repaired. The court below rightly held that these were not lay days, as the ship was not ready to receive cargo.

The log entries show that the winch was broken down on October 23d, 24th, 25th, and 26th. It is claimed that none of these days should be counted as lay days, as the condition of the winch interfered with the loading. The court below counted them as such days. But the entry on October 23d reads: "Loading fore and aft all day, and main from 10 a. m." That of October 24th is: "Loading all day fore and aft." October 25th it is: "Loading aft all day, and fore till 11 a. m., main till 4 p. m., when winch broke down again." October 26th it is: "Loading main and aft with hand winch."

The testimony of the master is that work in the main hatch was stopped on two occasions for the purpose of repairing the winch which had broken down. He also stated:

"That on October 26th loading was being carried on in main hatch by hand winch, which also could have been done in the main hatch while the steam winch was being repaired, as work in fore and aft hatches was being carried on with hand winches."

The charter party, in article 12, provided as follows:

"Master to give free use of vessel's winches, donkey boiler, and such tackle as may be on board."

The court below, holding that October 23d, 24th, 25th, and 26th must be treated as lay days, commented as follows:

"Assuming that the bark was bound to keep the steam winch in order and failed to do so, this would not justify striking out the whole day or all the days as lay days on which she failed to do so. The burden would lie upon the charterers to show to what extent loading and discharging were inter- fered with by this fact, and there is no evidence on the subject whatever."

[10] We see no error in the above statement and concur fully therein. At the argument in this court counsel for the charterer stated that, if we should conclude that the burden was on the charterer to prove how much it was delayed by reason of the condition of the steam winch, it should be given an opportunity to take additional testimony to prove how much time was actually lost and how much delay was occasioned. While an appeal in admiralty is a new trial, and new testimony can be taken if good reason therefor exists and sufficient cause is shown, it is well settled that such an application must be made to the court in proper time. In this case, the application not having been made until the case came on for hearing, and even then was made conditionally, it was made too late. The McDonald, 112 Fed. 681, 50 C. C. A. 423. The Rules in Admiralty provide that this court, or any judge thereof, may, upon sufficient cause shown, allow either appellant or appellee to take new proofs. But rule 6 requires that applications for such leave must be made within 15 days after the filing in this court of the apostles and upon at least 4 days' notice to the adverse party.

[11] This brings us to a consideration of the alleged error in allowing as demurrage days January 25, 26, 27, and 28, 1919, during which time the owner stopped the unloading of cargo at Philadelphia in order to take on new cargo as stiffening for another voyage with which the charterer was not concerned. It appears that after the arrival of the vessel at Philadelphia, which occurred on January 16, 1919, at 2 p. m., she commenced discharging cargo the next day, and continued the discharging on each succeeding day until January 24th at 10:30 p. m., when discharging was stopped to enable the boat to take on stiffening. The next day a pilot and tug came and took the ship from her dock out into the stream, in order that stiffening of coal might be loaded, and on January 27th and 28th she was loading coal as stiffening and took on 509 tons. This work was completed at 4:30 p. m. A tug then took the ship back to her dock, and at 7 p. m. of the same day she again commenced to discharge cargo, and continued to do so all that night and the next day and night, completing the work on January 30th, at 2 p. m. The following is the testimony concerning this transaction:

"Q. Do you recall, toward the conclusion of her discharge in Philadelphia, whether the discharge was interrupted at any time for the taking on of stiffening for her next succeeding charter? A. Yes, sir; it was discontinued on account to take the stiffening.

"Q. Was she discharging alongside a pier up to that time? A. Yes, sir.

"Q. Was it possible, if you know, for her to continue discharging overside on the pier, and at the same time from a lighter in the berth take on stiffening? A. No, sir.

297 F.—48

"Why not? A. On account that the lighter could not go alongside the vessel; the dock was too narrow.

"Q. Was the dock too narrow, or the berth too narrow, or both? A. When I say dock, that is the space between two piers. It was too narrow for the lighter to go along the vessel.

"Q. The space between the two piers was what I meant by the term 'berth'? A. Yes.

"Q. And that you say was too narrow to admit the lighter? A. Yes."

Another witness, who was the agent of the charterer, testified as follows:

"Q. Who ordered the Skomvaer to Pier 13, Port Richmond? A. I did.

"Q. As agent for the charterer? A. Yes.

"Q. Was there space enough when the Skomvaer was alongside that pier for the admission to the berth of any lighters? A. I have no direct recollection of that.

"Q. Was it a wide or narrow berth? A. A narrow berth.

"Q. The interruption for the loading of stiffening to which you testified occurred near the end of the discharging, did it not? A. Yes, sir.

"Q. If the Skomvaer had been ordered to a berth of sufficient width to admit a lighter, would not it have been possible to discharge ore cargo over her side to the pier and admit the stiffening at the same time?

"Mr. Herbert: That is objected to as incompetent, irrelevant, and immaterial.

"The Witness: Not at the same time.

"By Mr. Paul: Q. Did you ever hear of that process going on in sailing vessels? A. I cannot say I have."

The court below held that the days when the charterer could not discharge because she was taken from the discharging dock into the stream to load her with stiffening were to be counted as demurrage days, and stated the reason for so holding as follows:

"Although she was not ready to discharge cargo at Philadephia after being removed from the berth to the stream for the purpose of taking on the necessary stiffening, those days are demurrage days, because the charterers named a berth which was so narrow that the stiffening could not be loaded into her there."

The provision as to loading or discharging berths is contained in article 18 of the charter party and is as follows:

"Vessel to move to such loading and discharging berth or berths as charterers may direct where she can lie safely afloat."

There is nothing in the above article, or in any of the provisions in the charter party as we read them, which made it the duty of the charterer to supply a berth from which stiffening could be loaded from a lighter. Neither is there any evidence in the record to show that the stiffening could not have been loaded into the vessel from the pier or dock, nor that there was any controlling custom to load from lighters. The evidence discloses that, when the ship was loaded at Bahia, the stiffening was taken out of the ship and placed on the pier, and we are unaware of any reason why the stiffening put into the ship at Philadelphia could not have been put in from the pier in a similar manner, or any rule of law which obligated the charterer under article 18 to provide a berth which would have permitted the stiffening to be put aboard from a lighter. We think, therefore, that it was error to regard as demurrage days January 25th, 26th, 27th, and 28th. This

would reduce the number of the demurrage days to six, if the court had not fallen into error in assuming that all the lay days the charterer was entitled to had been used up at Bahia before the ship started on her voyage. But as we have seen, in an earlier part of this opinion, error was committed in counting as lay days October 8th, 9th, 10th, and 11th, the number of the demurrage days must be further reduced by four, and this leaves the number of demurrage days to which the libelant is entitled cut down to two, instead of the ten allowed in the court below.

[12] There remains to be considered the finding of the court below that the ship's owner was under obligations to pay a towage charge of $1,000, incurred in towing the ship from the mouth of the Delaware Bay to her discharging dock in Philadelphia. It appears that at the request of the master the charterers disbursed $1,000 in payment of a bill contracted by the captain of the vessel for her towage from Brown Shoals, Delaware Breakwater, to the port of Philadelphia, a distance of 103 miles. This payment the charterers in their answer alleged was an "advance" for the account of the schooner "for towage" and they sought its recovery from the owner. The court below held that, as between the owners and the charterers under the written contract which the parties made, the obligation to pay for this towage was upon the owners. As this is claimed to be error, we must determine whose duty it was to make this payment. Article 9 of the charter party provided as follows:

"Charterers to pay all port charges at both loading and discharging ports, including custom house fees, pilotage, towage, tonnage dues, permanency dues, wharfage, quay or dock dues, boca dues, if any maintenance dues, on vessel and/or lighters."

The evidence is that the channel from the sea to Philadelphia is very tortuous, and in some places very narrow, and without a tug there would be danger of going aground; and it appears that the harbor limits of the port of Philadelphia extend clear down the Delaware river to Cape May, and that the port of Philadelphia extends on the south of the state line at Marcus Hook according to one witness. The limits of the harbor, it is testified, are limited to a line drawn between Cape May and Cape Henlopen.

The testimony shows that it is customary for sailing vessels of the type of the Skomvaer, inbound, to be towed the entire distance from the mouth of the Delaware Bay to the Philadelphia anchorage. The same custom prevails as to outbound vessels. It is one continuous towage process inbound and outbound. This is done to safeguard the boats from grounding, and it also appears that in rendering bills for such services it is the custom to make no distinction between that part of the towage which is inside the legal limits of Philadelphia and that part of the towing which is beyond the legal limits of that port. A shipbroker, who had followed that occupation in Philadelphia for 46 years, after stating a conversation he had had with a representative of the charterers over the payment of the towage bill in this case testified as follows:

"Q. Up to the time of your conversation with Mr. Halzell, had any question been raised *under charters of this kind* by the charterers as to their liability for the towage? A. No, sir.

"Q. Was it or was it not customary for charterers, *under charter parties of this kind*, up to the time of the conversation that you have just mentioned, to pay the towage bill for the entire towage from the Capes to Philadelphia anchorage? A. There never was any objection.

"Q. You mean that the charterers never made any objection to paying it? A. No, sir; they never objected."

Again he testified as follows:

"Q. I understand that you say that this charge of towing a vessel from the Delaware Breakwater to the port of Philadelphia is customarily paid by the charterer? A. *Yes, sir; according to that form of charter party.*"

Another witness engaged in the business of steam towing in the port of Philadelphia for more than 30 years, and familiar with port and harbor conditions in Philadelphia, testified as follows:

"Q. What is the distance, if you know, between the mouth of Delaware Bay, or, in other words, Cape May, and the piers ordinarily used for discharging in Philadelphia? A. We call it about 103 miles.

"Q. Have you been over that body of water yourself? A. Oh, yes.

"Q. What is the custom of sailing vessels, if you know, in traversing that body of water? Limit your answer to the question of whether they move, if you know, under their own sailing power or whether they are towed. A. With a vessel of the type that is in question it is usual—in fact, it is generally the custom—for them to take a tugboat at the mouth of the Capes and tow to Philadelphia anchorage.

"Q. By that answer do you mean that it is customary for sailing vessels of the type of the bark Skomvaer to be towed the entire distance from the Capes to Philadelphia anchorage inbound? A. Yes.

"Q. What is the custom with reference to the outbound voyage for sailing vessels of the type of the bark Skomvaer? A. It is customary for them to tow to sea, and very often they tow out 10 or 15 miles seaward, further than the Capes.

"Q. Is it one continuous towage process inbound and outbound? A. Yes, sir.

"Q. Do you know of any practical business reason why it is safer or more convenient or expedient to tow these vessels over the course you have indicated rather than to have them move under their own sail power? A. It is due largely to the rig of the vessel, square-rigged vessel, and usually those vessels are of deep draft, and the channel up the Delaware River is narrow in places, and they take the towboats simply to safeguard themselves.

"Q. They do that to safeguard themselves from what? A. I would say from grounding."

It appears, too, that the Act of June 7, 1897, regulating inland navigation, makes it necessary for vessels navigating between Capes May and Henlopen and Philadelphia to have on board a pilot. The compulsory pilotage regulations become operative on inbound vessels on a straight line drawn between Cape Henlopen and Cape May, and it is testified that this has been the rule "about 40 years." A witness who had been connected with the port and harbor of Philadelphia for 38 years, and who at the time of giving his testimony was director of wharves, docks, and ferries, testified as follows:

"Q. Is pilotage compulsory in this port? A. Pilotage is compulsory on all foreign vessels, and all vessels bound to and from foreign ports, excepting in the case of American vessels solely laden with coal.

"Q. At what point do the compulsory pilotage regulations become operative on inbound vessels? A. That straight line drawn between Cape Henlopen and Cape May.

"Q. Has the condition which you just described been true for any considerable number of years? A. About 40 years, sir.

(297 F.)

"Q. Are you familiar with the method employed by sailing vessels in traversing the channel from Capes May and Henlopen to Philadelphia anchorage, and from Philadelphia anchorage to the open sea, through the capes? A. I am, sir.

"Q. Is it customary, and necessary, in your opinion, for sailing vessels to be towed into the port and harbor of Philadelphia?

"The Witness: I would say, as a result of almost 40 years' experience, that that is necessary, in the case of a square-rigged vessel; but fore and aft rigged vessels are often able to handle themselves under sail, if towed to the point known as the deep water point. That is about Wilmington creek. A fore and aft rigged vessel could handle itself, under sail, below that point.

❊ ❊ ❊

"Q. On a charter party which includes this language, 'Charterers to pay all port charges, at both loading and discharging ports, including customs house fees, pilotage, towage, tonnage dues, permanency dues, wharfage, quay or dock dues, boca dues, if any, maintenance dues, on vessels and all lighters, are you able to form an opinion as to whether the towage service from the Capes, to Philadelphia anchorage, or such towings as you have just described would be chargeable to the charterer?.

"The Witness: I think that anybody with any knowledge of shipping could answer that very distinctly.

"Q. In your opinion, is there any difference, under a clause of this kind between the liability of the charterer for towage and his liability for pilotage, wharfage, and the other charges?

"The Witness: Absolutely none. If they pay the pilotage, to my mind, they recognize the fact that the towage is necessary."

The court below did not consider the testimony as to the custom of towing inbound and outbound sailing vessels over the entire distance from the mouth of the Delaware Bay to Philadelphia as important. Neither was it regarded as important that the bills rendered for such services were for the entire towage, and had been always paid by the charterers without objection until this case arose. It was thought to have no bearing upon the question which this case presents, which is, as between the owners and the charterers, who are to pay for the towage. That question, the court said, depended upon the construction of the written contract between those parties, and added:

"As I construe this charter the owners must pay for the towage."

We are unable to concur in this view of the matter. The charter party expressly declares that the charterers are to pay "all port charges at both loading and discharging ports," including among other charges which it specifies pilotage and towage. This includes all necessary pilotage charges and all necessary towage charges to enable the vessel to reach the port of Philadelphia, which was the place of discharge. It appears that the act of Congress makes it compulsory for the vessel to have a pilot from the time it enters the mouth of the Delaware Bay, and the testimony makes it clear that in the case of a sailing vessel of the type of the Skomvaer it is necessary, usual, and proper for it to be towed from the mouth of the Bay to the wharf in Philadelphia at which the vessel was to discharge.

We can see no reason for holding that, while the charterer pays the pilotage charge, the owner is to pay the towage charge under a charter which declares that the charterer is to pay all "port charges," including pilotage and towage. If towage be necessary to reach the designated port of discharge, and it is necessary that this towage serv-

ice be begun outside the port, we cannot doubt that an agreement on the part of the charterer to pay all port charges, "including towage," covers towage begun outside the port and which was necessary to enable the vessel to enter the port. The duty to pay this charge was imposed upon the charterer by the charter, and the court below was in error in holding that the owner of the ship was liable therefor. The court in its opinion said of the towage charge that "it is no more to be split into towage to the port and towage in the port than is pilotage." We fully agree. But if it cannot be so split, and the charterer agreed to pay the towage charge, we fail to see what right the court has to relieve the charterer of the burden which he assumed and impose it upon the owner of the ship, who never assumed it.

Before concluding this opinion, attention should be called to a provision to be found in article 15 of the charter party, which reads that for each and every day's detention of the vessel by default of the party of the second part there shall be paid a certain specified amount, "and pro rata for part of a day." In estimating the number of demurrage days, this provision seems to have been disregarded. For example, it appears that the court counted January 30th as a full day, although the ship's log shows that the discharging was completed at 2 p. m.

The cause is remanded to the court below, with directions to ascertain the amount of the demurrage in conformity with this opinion, and to modify its decree in accordance herewith.