**THE BALDHILL.**

**UNITED STATES v. ATLANTIC REFINING CO.**

**No. 272.**

Circuit Court of Appeals, Second Circuit.

May 5, 1930.

Charles H. Tuttle, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. U.' S. Atty., of New York City, of counsel), for the United States.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Howard M. Long and John H. Stone, both of Philadelphia, Pa., and Eugene Underwood, Jr., and Roscoe H. Hupper, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The charter party, dated September 5, 1924, hired the tank steamer Baldhill to the appellee to proceed to one safe United States gulf port, excluding Houston; the charterers having the privilege of loading at:

"(Atreco and Port Arthur or Sabine to count as one port)

"(Smith's Bluff and Sabine or Port Arthur to count as one port)

"(Beaumont and Sabine, to count as one port)

"(Pasadena or Sinco and/or Texas City to count as one port)."

A further provision of the charter was that the vessel proceed to the loading port "or so near thereunto as she may safely get (always afloat) and there load from the fac-

tors of the said charterer a full and complete cargo * * * and being so loaded shall therewith proceed * * * to one safe United States Atlantic port north of Cape Hatteras."

Other provisions were:

"5. The Steamer shall load and discharge at a place or at a dock or alongside lighters reachable on her arrival, which shall be indicated by Charterer, and where she can always lie afloat, any lighterage being at the expense, risk, and peril of the Charterer. Charterer has the right of shifting the Steamer at port of loading and/or discharge from one berth to another on payment of all expenses incurred. Time used in shifting to count.

"6. The laying days shall commence from the time the Steamer is ready to receive or discharge her cargo, the Captain giving six hours' notice to the Charterer's Agents, berth or no berth. * * *

"7. A. Orders for loading port to be furnished Owner's or their agents before vessel is ready to leave her last port of discharge prior to entering upon this charter."

The vessel sailed from Baltimore September 13, 1924. On September 16, before the arrival of the vessel, a motor ship was sunk in the upper reaches of the Sabine Neches Canal between Port Arthur and the Neches river, which completely blocked the channel, so that no vessel could pass from Port Arthur to Smith's Bluff. It was necessary that this ship, in order to pass from the high seas to Smith's Bluff, navigate Sabine Pass to the Port Arthur ship canal up to Port Arthur, and thence through the Sabine Neches canal to the Neches river, and thence to Smith's Bluff. On September 19, appellant's representative was advised of the situation, communicated with the appellee, and asked him to substitute a loading place other than Smith's Bluff because of its inaccessability. This the appellee declined to do. The steamer arrived off Sabine Bar and anchored at 3:06 p. m. on September 20 and was tendered by telegraph at 4:30 p. m. September 20. The tender was declined by telegram under the same date. She remained off Sabine Bar until October 2, when she passed to a terminal at Port Arthur for bunker oil. She remained there until October 8, when she was able to proceed up the canal to Smith's Bluff. The sunken ship was raised October 6th and permission given for vessels bound down stream to go through on October 7. She was loaded at Smith's Bluff

from 12:35 a. m. October 9th, to 8 p. m. the same day, then shifted to Sabine and commenced loading at 9 a. m. October 11th, and finished at 3:25 p. m. the same day. She arrived in Philadelphia October 19th, and was tendered for discharge, which took 23 hours 55 minutes. The total time for loading and discharging was 50 hours and 45 minutes. The claimed demurrage for the time lost was due to delay caused by the sunken ship obstructing the canal.

This claim is based upon the theory that the steamer was an "arrived vessel" when she was tendered at Sabine Bar September 20, 1924. The wreck in the channel was not due to fault of either party. The question is presented whether the vessel had arrived for loading at the port "or so near thereunto as she may safely go" when she was lying in the open roadstead, where it is conceded cargo is not customarily laden or discharged and where it would be unsafe to attempt such an operation. The charterer was specifically given the privilege of loading at Smith's Bluff. The charterer's notice to the shipowner stated that the cargo was to be furnished at Smith's Bluff, to an amount which the steamer could safely navigate, thence to Port Arthur, and the balance necessary to complete the cargo was then to be lightered down from Smith's Bluff to the ship, and in this manner she was finally loaded. The steamer had arrived within the enlarged loading port as described (Smith's Bluff, Sabine or Port Arthur). Still she had not arrived in the sense that she was entitled to give notice of readiness when she dropped anchor off Sabine Bar. The loading place was Smith's Bluff; it was planned only to do the topping off at Port Arthur; and apparently the idea of treating Smith's Bluff or Sabine or Port Arthur as one port was solely to enable the charterer to load a full and complete cargo as required by the charter, which could not be done at Smith's Bluff alone. The charterer was privileged only to require the vessel to proceed to "one safe United States Gulf port."

In Sailing Ship Carston Co. v. Hickie Co. (1885) 15 Q. B. D. 580, 5 Asp. Cas. 499, the court, considering whether a vessel had sailed from the last port in Great Britain, and holding that she had passed the limits, defined those limits substantially by saying:

(1) The thing to consider is the "commercial or business" port as distinguished from the "legal" port.

(2) A port is a place intended for loading or unloading goods; hence includes the natural shelter surrounding water, as also sheltered water produced by artificial jetties, etc.

(3) If the area in question is a place of only comparative safety, the question is whether people in fact have their ships loaded or unloaded there; if they do, it is part of the port.

(4) To find out how much further out the port may extend, the question is whether the port authorities have assumed jurisdiction over vessels therein and the ships have submitted to port discipline.

In Mencke v. Cargo of Java Sugar (1902) 187 U. S. 248, 23 S. Ct. 86, 87, 47 L. Ed. 163, the Supreme Court considered a charter party providing "discharge at New York or Boston or Philadelphia or Baltimore, or so near the port of discharge as she may safely get and deliver the same, always afloat, in a customary place and manner, in such dock, as directed by charterers, agreeably to bills of lading." Lighterage, if any, was to be at the expense of the charterers' vessel. When the vessel arrived in New York, she was directed by the charterers to proceed to a dock above the Brooklyn Bridge, but the masts of the ship were so high she could not go under the bridge without breaking off the tops. The parties agreed to unload at a dock below the bridge and have the cargo lightered to the dock specified by the charterers without prejudice to their rights. Holding that the lighterage must be paid by the charterers, it was said that the clause giving them the right to appoint the dock of discharge of cargo contained other provisions as to safe delivery, and the fair construction was that the vessel may be directed only to safe places where she could remain afloat, and that the bridge was as much an obstruction as a sand bar might be. In a charter party containing lay days to commence "from the time the captain reports his vessel ready to receive or discharge cargo, having fulfilled custom house formalities, whether berth or cargo available or not * * * discharge at such dock as charterers may designate," it was held that the lay days commenced from the date of notice of readiness, where the ship had passed the customs before an obstruction in the harbor, due to a sinking vessel, prevented her passage. It appears that another berth might have been provided before this sinking. The court pointed out that the casualty clause excepting "stranding and other accidents of navigation" might apply if the charterer had

actually been prevented from providing a berth before the sinking of the vessel. Bell & Co. v. Stewart (C. C. A. 1929) 31 F.(2d) 44. If the ship arrives and is ready to load as far as she is concerned, she must arrive in port, using the word in a commercial sense. Leonis S. S. v. Rank, [1908] 1 K. B. 499. And the phrase, "or as near thereunto as she can safely get and always lay and discharge afloat," requires the charterers, when the port is not safe and the vessel cannot land a cargo at any anchorage near it, to unload the ship outside the sand bar over which it was dangerous to pass, because the unloading port must be a place of safe anchorage where she may discharge afloat. The Gazelle & Cargo (1888) 128 U. S. 474, 9 S. Ct. 139, 32 L. Ed. 496. Where a charter party provided "charterers to pay all port charges including custom house fees, pilotage, towage, etc.," and the ship arrived at the Delaware breakwater en route to Philadelphia and was towed 100 miles, as was the custom, due to a narrow tortuous channel, a holding that the charterer must pay the towage is based upon the view that, if "it is necessary that this towage service be begun outside the port, we cannot doubt that an agreement on the part of the charterer to pay all port charges, 'including towage,' covers towage begun outside the port and which was necessary to enable the vessel to enter the port." The Skomvaer (C. C. A. 1924) 297 F. 746, 757. So too, where the terms of the charter party provided for lay days "commencing from the time the captain reports his vessel ready to discharge cargo in New York Harbor, time consumed in shifting vessel to count as lay days. * * * Vessel to move to such loading and discharging berths as charterers may direct where she can always lie safely"; and where the vessel arrived in New York Harbor and gave notice to charterers who towed her up Newtown creek, lay days were held to commence when the captain gave his notice, although the notice was given before the vessel arrived at her berth ready to discharge. The Edward T. Stotesbury (C. C. A. 1911) 187 F. 111, 112. In Yone Suzuki v. Central Argentine Ry. (C. C. A. 1928) 27 F.(2d) 795, 802, the charter party provided the ship was to proceed to Buenos Aires "or as near thereunto as she may safely get, and always lie afloat * * * lay days for discharging as 'commencing from twenty-four (24) hours after arrival at or off discharging port whether steamer is in berth or not." The ship went to Buenos Aires and anchored in the roadstead 20 miles from the city water front. All ships had to anchor there to take on pilots, undergo quarantine inspection, etc. Formerly cargoes were discharged at the roads, which were under the port authority and part of the port. The master gave notice of his arrival at the roads. It was held that lay days commenced on such notice. The provision of the charter party that the ship is "at or off" port was sufficient for the commencement of lay days and that the ship was ready to discharge within the intention of the parties when she thus arrived at or off Buenos Aires. In Anderson v. J. J. Moore & Co. (C. C. A. 1910) 179 F. 68, 69, the charter provided for the ship to proceed to San Francisco "to discharge at any safe wharf or place within the Golden Gate, and deliver the said full and complete cargo in the usual and customary manner at any safe wharf or place. * * * To be discharged as customary, in such customary berth as consignees shall direct," lay days "to commence when the ship is ready to discharge and notice thereof has been given by the captain in writing." It was held that lay days did not commence to run until the ship had reached the berth designated by the consignee. The delay in reaching that berth, when due to congestion not to the fault of the consignee, cannot be counted as part of the lay days, for the ship is not ready to discharge under the charter party until she arrives at her berth. See, also, Armement Adolf Deppe v. John Robinson & Co., (1917) 2 K. B. 204; Dahl v. Nelson, Donkin & Co., (1881) 6 A. C. 38.

The cargo contracted to be carried by this ship was located at Smith's Bluff, and could not be moved to the ship, since the channel was blocked. This was the one cargo which the appellee had to transport. The particular place at which the cargo was to be loaded was designated, and it became the ship's duty to proceed to that place, and other loading places were immaterial under the terms of this charter. This obstruction proved to be temporary, and the situation had to be endured but a short time, during which time the parties to the charter had committed themselves to loading at Smith's Bluff only. The blocking of the channel was due to a peril of navigation which was a risk of the steamer under a paragraph of the charter. Melcalfe v. Britannia Iron Wks. Co. (1877) 2 Q. B. Div. 423, 426. Within the construction placed upon similar provisions of charter parties in the cases referred to, the loss here must be held to be due to the obstruction of the channel, and falls upon the ship. No notice of arrival at Sabine Bar, where the ves-

sel could not have loaded safely, will be held to commence the running of lay days.

Decree affirmed.