### CAMPBELL et al. v. AMERICAN EXPORT LINES, Inc.
### THE EXMOOR.

District Court, S. D. New York.
March 4, 1940.

44

William L. Standard, of New York City (Max Lustig, of New York City, of counsel), for plaintiffs.

Haight, Griffin, Deming & Gardner, of New York City (Arthur O. Louis, of New York City, of counsel), for defendant.

GALSTON, District Judge.

The plaintiffs are a group of nineteen seamen who were hired by the defendant to serve on board its vessel, the S. S. Exmoor, on a voyage from New York to Mediterranean and Black Sea ports and nearby Atlantic ports, from Lisbon to Casablanca, and back to the United States, at a stipulated wage to be paid each month to each of the plaintiffs. At the opening of the trial permission was granted an additional seaman to join as a party plaintiff. On July 29, 1938, articles of agreement were signed between the master and the seamen. These articles included the following provision: "It is agreed that a bonus of fifty dollars ($50.) will be paid to the crew in case that this ship enters any Spanish port as agreed between the company and the National Maritime Union on September 29, 1937."

The agreement referred to between the defendants and the National Maritime Union contained the following terms:

"Effective with the sailing of S. S. Exmoor the unlicensed personnel of ships going into ports of Spain will be awarded fifty dollars bonus for the trip until such time as the United States Maritime Commission cancels similar bases applicable to government operated ships which may call at Spanish ports."

"It is agreed that with the exception of ships going into ports of Spain no bonus will be paid."

The plaintiffs allege that the vessel having taken on board a cargo proceeded therewith from New York for the port of Malaga in Spain; that the plaintiffs remained on board during the voyage and performed their duties. They claim, pursuant to the foregoing articles of agreement, to be entitled each to the sum of fifty dollars.

The answer denies liability and alleges that the Exmoor did not go into a port of Spain but, on the contrary, anchored at a substantial distance off the breakwater; that the Exmoor had taken on board a part cargo; that she proceeded therewith toward the port of Malaga for orders; that she anchored at a substantial distance from the breakwater forming the port and remained at such anchorage for approximately two days, and upon receiving orders proceeded to other ports and thence to the United States to a final port of discharge.

The material facts are not in dispute. It appears that the Exmoor arrived off the port of Malaga on August 19, 1938; that she was met by a pilot and proceeded to an anchorage south of the outer breakwater. The master locates the point of anchorage on the chart at about a half mile therefrom. The vessel remained there for two days, two hours and nineteen minutes, during which time the crew was off sea watch and on port time. Some painting and other miscellaneous work were done on the vessel. While at anchorage she was visited by an agent of the defendant and the master was instructed both by the pilot and by the agent to remain outside. At the end of the period indicated the vessel departed without entering either the inner or outer harbor, and during that time was visited by no official of the Spanish government. There was no inspection of any kind, no production of clearance papers, and above all, there was no visit by a health officer, though it appears that customarily the health officer is the first to board the vessel as a condition precedent to entrance to the harbor. No customs or port fees were paid. The vessel neither loaded nor unloaded, but proceeded on her way to other ports.

■ There is nothing in the record to explain why the vessel did not enter the port. Perhaps the pendency of the civil war in Spain, of which judicial notice may be taken, is the explanation.

■ In the circumstances thus recited it appears that the plaintiffs are not entitled to the bonus referred to in the articles of agreement, for the waters in which the Exmoor was anchored were not part of the port of Malaga.

Judge Rogers in Hamburg-American Steam Packet Co. v. United States, 2 Cir., 250 F. 747, 764, in a full review of authorities, British and American, concluded:

"From what has been said it appears that the word 'port' is a somewhat indefinite term; that its meaning is not exact, but depends upon the connection in which it is used; that it has been employed to designate a place where ships are accustomed to load and unload goods, or to take on and let off passengers, and where persons and merchandise are allowed to pass into and out of the realm. We find nothing in the cases examined which leads us to believe that a place on the high seas, where ships are not accustomed to stop, or to discharge or to take on cargoes, where vessels cannot anchor, and which is not a place of safety for either ship or goods, can be regarded as a port."

Now though it is true that the Exmoor anchored outside the breakwaters, it was not a place at which vessels are accustomed to stop either to discharge or take on cargoes. Conceivably, as I indicated at the trial, if the point of anchorage was a place for loading or unloading, and to which, for example, lighters came for that purpose, some reason might exist for considering the anchorage as part of the port. On the contrary in this record there is no such proof. Judge Brown said, in Devato v. Eight Hundred and Twenty-Three Barrels of Plumbago, D. C., 20 F. 510, 516: "The port is not any place within the geographical limits of the same name where ships might load and unload, but where they in fact do so, i. e., where they are accustomed to do so."

See The Baldhill, 2 Cir., 42 F.2d 123, at page 125. United States v. Morel, Fed. Cas. No. 15,807; United States v. New Bedford, Fed. Cas. No. 15,867.

The complaint must be dismissed and judgment entered for the defendant.